**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, | : : : | |
| Plaintiff, | : : | Civil Action No.: 17-1701 (RC) |
| v. | : : | Re Document Nos.: 19, 21 |
| FEDERAL BUREAU OF INVESTIGATION, *et al.*, | : : : : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

**DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT;
GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.  INTRODUCTION**

In this lawsuit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, Plaintiff the Reporters Committee for Freedom of the Press ("RCFP") challenges the Federal Bureau of Investigation's ("FBI's") response to a request for records relating to the FBI's impersonation of documentary filmmakers and film crews.  In early 2017, it was publicly disclosed that the FBI had impersonated a documentary film crew to investigate cattle rancher Cliven D. Bundy ("Bundy") and his followers following a 2014 armed standoff between Bundy and law enforcement.  RCFP subsequently filed an eight-part FOIA request seeking, *inter alia*, the production of records referencing any other instance of impersonation of a documentary filmmaker or film crew by the FBI in connection with a criminal investigation since 2010 ("Item 6"), and records of professional credentials, websites, and business cards used by FBI agents in connection with the impersonation of documentary filmmakers or film crews since 2010 ("Item 7").

RCFP filed suit against the FBI and the Department of Justice ("DOJ") in August 2017 after the FBI failed to release any documents in response to its FOIA request. The FBI subsequently issued a so-called "*Glomar*" response pursuant to FOIA Exemption 7(E) as to all records responsive to Items 6 and 7 and not related to the criminal investigations of Bundy and of one of his supporters, Gregory Burleson ("Burleson"), refusing to confirm or deny the existence of any such records. Defendants now move for summary judgment solely on the issue of whether the FBI's *Glomar* response is appropriate, while RCFP cross-moves for summary judgment on the same issue. Because it finds that the impersonation of documentary film workers is an enforcement technique commonly known to the public, and that acknowledging the existence or absence of records would not reduce or nullify the effectiveness of that technique, the Court denies Defendants' motion and grants RCFP's cross-motion.

## II. FACTUAL BACKGROUND

### A. The FBI's Impersonation of News Media

While law enforcement impersonation of journalists is a practice that has been documented for decades, the FBI's impersonation of news media has received increased scrutiny in recent years. In 2014, it was widely reported that the FBI had impersonated an Associated Press ("AP") editor in a 2007 investigation of a Seattle high school student suspected of sending bomb threats. Compl. ¶ 13, ECF No. 1; *see, e.g.*, *FBI Says It Faked AP Story to Catch Bomb Suspect*, Associated Press, Oct. 28, 2014, Declaration of Katie Townsend ("Townsend Decl.") Ex. N, at 147,[1] ECF No. 21-3.[2] The story generated significant backlash, and AP's general

---

[1] Because of the volume of documents filed by the parties as exhibits to their respective declarations in support of summary judgment, the Court refers to PACER page numbers when citing to those exhibits throughout this opinion.

[2] RCFP includes a number of news articles as exhibits to its summary judgment briefs, and asks that the Court take judicial notice of the articles pursuant to Fed. R. Civ. P. 201. Pl.'s

counsel delivered a letter to the Attorney General strongly condemning the FBI's actions a few days later.  Compl. ¶ 14; Letter from Karen Kaiser, AP General Counsel, to Eric Holder, United States Attorney General (Oct. 30, 2014), Townsend Decl. Ex. Q, at 165.  Then FBI director James Comey sent a public letter to the editor of the New York Times on November 6, 2014 acknowledging the operation, representing that the FBI's impersonation of a journalist was a "proper and appropriate" technique under FBI and DOJ guidelines, and indicating that as of 2014, "the use of such an unusual technique would probably require higher level approvals than in 2007, but would still be lawful and, in a rare case, appropriate."  Letter from James Comey, FBI Director, to the Editor of the New York Times (Nov. 6, 2014), Townsend Decl. Ex. E, at 53.

In 2016, the DOJ Office of the Inspector General issued a detailed report reviewing the 2007 impersonation.  Compl. ¶ 12; Office of the Inspector Gen., A Review of the FBI's Impersonation of a Journalist in a Criminal Investigation, U.S. Dep't of Justice (Sept. 2016), Townsend Decl. Ex. F ("OIG Report"), at 55.  The OIG Report revealed that, following the 2007 impersonation, the FBI had implemented new guidelines for the procedures FBI agents were to follow before impersonating members of the news media or documentary filmmakers in connection with investigations.  Compl. ¶ 15; *see generally* OIG Report.  The OIG Report distinguished between the policies applicable to the impersonation of news media and those applicable to the impersonation of documentary filmmakers.  Compl. ¶ 17; OIG Report 65 n.10.  And in 2018, in response to one item of RCFP's FOIA request at issue in this case, the FBI released current and past guidelines applicable to the impersonation of news media and

---

Mem. Supp. Cross-Mot. 3 n.3, ECF No. 21-1.  The Court grants the request and takes judicial notice of these documents.  *See, e.g.*, *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015) (taking judicial notice of existence of news articles); *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (noting that "court[s] may take judicial notice of the existence of newspaper articles . . . that publicize[]" certain facts).

documentary filmmakers. *See* Pl.'s Mem. Supp. 6–7; Pl.'s Statement of Material Facts ("SMF") ¶ 46; FBI Guidelines, Townsend Decl. Ex. I, at 46. The guidelines also explicitly differentiate between the policies applicable to FBI impersonation of news media in the course of an investigation and those applicable to the impersonation of documentary filmmakers. *See generally* FBI Guidelines.

### B.  2014 Bundy Standoff and Operation Longbow

Bundy is a Nevada cattle rancher involved in a long-running dispute with the U.S. government over grazing rights to federal land surrounding his ranch. *See, e .g.*, *United States v. Bundy*, No. 2:12-cv-084, 2013 WL 3463610, at *1 (D. Nev. July 9, 2013). After the government obtained multiple judgments against Bundy in federal court, the United States Bureau of Land Management ("BLM") attempted to seize and remove several hundred head of Bundy's cattle from public land in early 2014. *See* Compl. ¶ 8; *In re Bundy*, 840 F.3d 1034, 1036 (9th Cir. 2016). An armed confrontation erupted between BLM and hundreds of Bundy's supporters, following which BLM released the cattle and withdrew from the area. *See* Compl. ¶ 8; *In re Bundy*, 840 F.3d at 1036. Bundy was eventually arrested and prosecuted in connection with the standoff. Compl. ¶ 8. So were several of his supporters, including Burleson. *Id.*

In the course of Bundy and Burleson's criminal prosecution, the government revealed that the FBI had impersonated documentary filmmakers to gain access to suspects as part of its investigation of the standoff. *Id.* ¶¶ 9–11. In January 2017, a court order in Burleson's case indicated that the court had reviewed video-recorded statements Burleson had given to investigators posing as documentary filmmakers. *Id.* ¶ 10. In February 2017, Bundy claimed in a motion in limine that FBI agents had used fake professional credentials, websites, and business cards as part of the operation, to lend credibility to their fake documentary film company. *Id.*

4

¶ 11 (citing Bundy Mot. in Limine, *United States v. Bundy*, No. 2:16-CR-00046 (D. Nev. Feb. 16, 2017), ECF No. 1488). In its opposition to the motion, the government acknowledged that Bundy had spoken to undercover agents in a hotel room "under circumstances designed to make Bundy believe that he was participating in [a] documentary." *Id.* ¶ 10 (quoting Gov't Opp. Mot. in Limine 2, *United States v. Bundy*, No. 2:16-CR-00046 (D. Nev. Feb. 16, 2017), ECF No. 1591). And in March 2017, an FBI agent testified at Burleson's trial that FBI agents had impersonated a documentary film crew to lure Bundy and other suspects into talking with them. *Id.* ¶ 9.

The revelations generated significant media attention. *See, e.g.*, Andrew Blake, *FBI Posed as Documentary Filmmakers to Conduct Interview with Bundy Ranch Supporters*, Washington Times (Mar. 24, 2017), Townsend Decl. Ex. B, at 12; Jenny Wilson, *Bundy Defendants Interviewed in Undercover FBI Operation*, Las Vegas Review-Journal (Mar. 22, 2017), Townsend Decl. Ex. A, at 9. In a lengthy article, online newspaper The Intercept dissected the FBI operation, coined "Operation Longbow." *See* Ryan Devereaux & Trevor Aaronson, *America Reloaded: The Bizarre Story Behind the FBI's Fake Documentary About the Bundy Family*, The Intercept (May 16, 2017), Townsend Decl. Ex. C, at 15. The article described how the Bundy family was initially approached by undercover FBI agents, and discussed several interviews undertaken as part of the operation. *See generally id.*

### C.  RCFP's FOIA Request

On April 12, 2017, RCFP submitted an eight-part FOIA request to the FBI regarding its impersonation of documentary filmmakers and film crews. Compl. ¶¶ 18–19; April 12, 2017 FOIA Request, Compl. Ex. A, ECF No. 1-1; Defs.' SMF ¶ 1, ECF No. 19-2. Items 1 through 5 of the request involved records related to Operation Longbow and to the criminal prosecution of

5

Bundy and Burleson. Item 1 sought the production of all records mentioning the terms "Longbow" or "Longbow Productions" since January 1, 2010. Defs.' SMF ¶ 1. Items 2 and 4 sought all records concerning or referencing the impersonation of documentary film workers in connection with any criminal investigation of, respectively, Burleson and Bundy. *Id.* Item 3 sought the October 2014 video recording of Burleson made as part of the operation, and Item 5 sought a release form referenced in a government motion in Bundy's criminal case. *Id.*

Items 6 through 8 of the request sought materials beyond the Bundy standoff investigation. Item 8 targeted "records of the FBI's policies and practices concerning the impersonation of documentary filmmakers and/or documentary film crews." *Id.* And items 6 and 7 targeted records relating to the FBI's impersonation of documentary filmmakers beyond the investigation of Bundy and Burleson. *Id.* Item 6 requested the production of "[a]ll records . . . referencing any other instance of impersonation of a documentary filmmaker and/or a documentary film crew by the FBI in connection with any criminal investigation since January 1, 2010." *Id.* Item 7 requested the production of "[r]ecords of any 'professional credentials, websites and business cards' used by FBI agents in connection with the impersonation of a documentary filmmaker and/or a documentary film crew since January 1, 2010." *Id.*

In its initial response, the FBI split RCFP's request into four distinct groups. Compl. ¶ 23; *see* FBI FOIA Responses, Compl. Ex. B., ECF No. 1-2. The FBI assigned Request No. 1372347-000 to items 2, 3, and 5, and gave a *Glomar* response to the request pursuant to FOIA Exemption 7(E). Defs.' SMF ¶ 2; Declaration of David M. Hardy ("Hardy Decl.") ¶ 12, ECF No. 19-3. The FBI assigned Request No. 1372342-000 to items 1 and 4, and asserted that FOIA Exemption 7(A) prevented the disclosure of any records in response to the request. Compl. ¶ 26; FBI FOIA Responses 15. Item 8 was assigned Request No. 1372351, with the FBI stating that

processing of the request would be delayed due to unusual circumstances. Compl. ¶ 27. And items 6 and 7 were assigned Request No. NFP-71761, for which the FBI stated that RCFP's request did not contain enough descriptive information to permit a search. Defs.' SMF ¶ 7. On June 5, 2017, RCFP appealed the FBI's responses to the entire request. Compl. ¶ 28; June 5, 2017 FOIA Appeal, Compl. Ex. C, ECF No. 1-3. The appeal of Request No. 1372351-000 was dismissed on July 5, 2017 because the request was still pending. Compl. ¶ 33; July 5, 2017 Denial, Compl. Ex. D, ECF No. 1-4.

### D.  Procedural History

After failing to receive any further update on the status of its appeal, RCFP filed suit on August 21, 2017. *See generally* Compl. Defendants filed their answer on September 25, 2017. Answer, ECF No. 8. Defendants asserted as a defense that some or all of the records were exempted from disclosure pursuant to FOIA exemptions. *Id.* at 1. On May 8, 2018, based on the parties' proposal, the Court directed the parties to first brief summary judgment solely on the propriety of the FBI's *Glomar* response. Min. Order (May 8, 2018).

Defendants filed their motion for partial summary judgment on July 23, 2018. Defs.' Mot. Partial Summ. J., ECF No. 19. In the motion, Defendants indicated that the FBI has modified its responses to RCFP's request. Defs.' Mem. Supp. Partial Summ. J. 6, ECF No. 19-1. The FBI now provides a *Glomar* response pursuant to exemption 7(E) to all records sought under items 6 and 7 that are not related to the criminal investigation of Bundy and Burleson. Defs.' Mem. Supp. 6; Defs.' SMF ¶¶ 12–13. That is to say, the FBI now provides a *Glomar* response as to the existence of any records referencing the impersonation of documentary film workers, or of any records of credentials, websites, or business cards used in connection with such an

impersonation, in connection with any criminal investigation outside of the two for which the use of the technique has already been revealed.  *See* Defs.' SMF ¶¶ 12–13.

On September 14, 2018, RCFP filed its cross-motion for summary judgment and opposition to Defendants' motion as to the FBI's new *Glomar* responses.  Pl.'s Cross-Mot. Partial Summ. J., ECF No. 21.  Defendants filed their opposition to RCFP's motion and reply in further support of their motion on October 12, 2018, Defs.' Reply, ECF No. 26, and RCFP filed its reply on November 2, 2018, Pl.'s Reply, ECF No. 27.  The cross-motions are now ripe for consideration.

### III.  LEGAL STANDARD

The Freedom of Information Act "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'"  *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)).  "[D]isclosure, not secrecy, is the dominant objective of the Act."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  FOIA accordingly "mandates release of properly requested federal agency records, unless the materials fall squarely within one of nine statutory exemptions."  *Hunton & Williams LLP v. U.S. EPA*, 346 F. Supp. 3d 61, 72 (D.D.C. 2018) (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011)).  "[T]he exemptions are 'explicitly exclusive,'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *FAA Adm'r v. Robertson*, 422 U.S. 255, 262 (1975)), and "it is the agency's burden to show that withheld material falls within one of those exemptions," *Taplin ex rel. Lacaze v. U.S. Dep't of Justice*, 967 F. Supp. 2d 348, 353 (D.D.C. 2013).

"FOIA cases typically and appropriately are decided on motions for summary judgment."  *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  Summary

judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). The reviewing court's determination may be based on the record and agency affidavits "if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). Generally, a reviewing court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

Before invoking Exemption 7 of FOIA, an agency "'must, as a preliminary matter,' make a 'threshold' showing 'that the records were compiled for a law enforcement purpose.'" *Pinson v. Dep't of Justice*, 313 F. Supp. 3d 88, 113 (D.D.C. 2018) (quoting *Kay v. FCC*, 976 F. Supp. 23, 37 (D.D.C. 1997). To withhold documents under exemption 7(E), the agency must then show that the documents sought contain law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

## IV. ANALYSIS

Defendants move for partial summary judgment with respect to the FBI's *Glomar* response to portions of Items 6 and 7 of RCFP's request. Defendants argue that the records

sought all relate to impersonation of documentary film workers, a purported law enforcement investigatory technique unknown to the public that could be disclosed and the effectiveness of which would be reduced by acknowledging the existence or nonexistence of records. Defs' Mem. Supp. 12–13. RCFP cross-moves for summary judgment on the same issue, arguing that the FBI's *Glomar* response is inappropriate because law enforcement impersonation of documentary film workers is already known and acknowledging the existence or absence of records would not risk circumvention of the law.[3] Pl.'s Mem. Supp. 12–19. The Court first addresses whether Defendants have made a threshold showing under FOIA Exemption 7 that the records over which the exemption is asserted were compiled for law enforcement purposes, before addressing whether Exemption 7(E) justifies a *Glomar* response. While Defendants have made the required threshold showing, the Court finds that the FBI's *Glomar* response is not justified under Exemption 7(E).

### A. Threshold Showing Under Exemption 7

The Court first briefly reviews whether the records sought were compiled for a law enforcement purpose. "'Ín order to withhold documents under Exemption 7, the agency must, as a preliminary matter,' make a 'threshold' showing 'that the records were compiled for a law enforcement purpose.'" *Pinson*, 313 F. Supp. 3d at 113 (quoting *Kay*, 976 F. Supp. at 37). "Agencies classified as law enforcement agencies receive a special deference in their claims of law enforcement purpose." *Id.* (citing *Pratt v. Webster*, 673 F.2d 408, 418 (D.C. Cir. 1982)). The D.C. Circuit has explained that an agency's investigatory records are considered law

---

[3] RCFP alternatively argues that upholding the FBI's use of the *Glomar* doctrine in this case would raise serious First Amendment concerns because it would chill journalists' speech, Pl's Mem. Supp. 19–25, and that the FBI has waived its ability to assert a *Glomar* response because it has officially acknowledged the existence of responsive records, *id.* at 25–29. Because it finds that Exemption 7(E) does not justify the FBI's assertion of a *Glomar* response here, the Court does not address these arguments.

enforcement records when "the investigatory activity that gave rise to the documents is 'related to the enforcement of federal laws,' and there is a rational nexus between the investigation at issue and the agency's law enforcement duties." *Jefferson v. Dep't of Justice*, 284 F.3d 172, 177 (D.C. Cir. 2002) (quoting *Pratt*, 673 F.2d at 420, 421). Non-investigatory records "may still meet the threshold requirement if they are akin to 'guidelines, techniques, and procedures for law enforcement investigations and prosecutions outside of the context of a specific investigation.'" *Pinson*, 313 F. Supp. 3d at 114 (quoting *Tax Analysts v. IRS*, 294 F.3d 71, 78 (D.C. Cir. 2002)). Defendants have made the required showing to assert Exemption 7.

Defendants argue that the FBI meets the Exemption 7 threshold because it is a law enforcement agency and it has presented a colorable claim that there is a rational nexus between the records sought and law enforcement activities. Defs.' Mem. Supp. 9. Defendants point out that the records sought in Items 6 and 7 all relate to the impersonation of documentary filmmakers and film crews, "an FBI law-enforcement technique supposedly used in undercover investigations." *Id.* (citing Defs.' SMF ¶ 16); *see* Hardy Decl. ¶ 33. Defendants argue that records pertaining to investigations where the technique was used would necessarily have been compiled for law enforcement purposes, because the ultimate goal of any investigation would have been to investigate or thwart criminal activity. *See* Defs.' Mem. Supp. 9; Hardy Decl. ¶ 33. RCFP does not address the threshold showing under Exemption 7 in its briefs.

The Court finds that Defendants have made the threshold showing required under Exemption 7. The FBI is a law enforcement agency, s*ee, e.g.*, 28 C.F.R. § 0.85; *Willis v. U.S. Dep't of Justice*, 581 F. Supp. 2d 57, 75 (D.D.C. 2008), and "its decision to invoke exemption 7" is accordingly "entitled to deference," *Willis*, 581 F. Supp. 2d at 75 (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998)). And the parties do not dispute that the

impersonation of documentary filmmakers and film crews is a law enforcement technique. The Court agrees with the FBI's justification that any investigative record related to the use of the technique would necessarily have been compiled for a law enforcement purpose. And to the extent any records sought as part of Item 7 would not be investigative records,[4] such records would still be akin to "techniques[] and procedures for law enforcement investigations," *Tax Analysts*, 294 F.3d at 78.

### B. *Glomar* Response Under Exemption 7(E)

Next, the Court determines whether the FBI's *Glomar* response pursuant to Exemption 7(E) was appropriate. "An agency may issue a *Glomar* response when 'to answer the FOIA inquiry would cause harm cognizable under' an applicable statutory exemption." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Wolf*, 473 F.3d at 374. That is to say, "[t]he agency must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information." *Id.* (citing *Wolf*, 473 F.3d at 374). Here, the Court finds that Exemption 7(E) does not justify the FBI's refusal to confirm or deny the existence or nonexistence of responsive records.

As an initial matter, the parties disagree on which standard to apply when evaluating the withholding of records pursuant to Exemption 7(E). Exemption 7(E) provides for the withholding of records that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). To invoke the "techniques and procedures" prong of the

---

[4] Whereas Item 6 is explicitly restricted to records referencing impersonation of documentary film workers "in connection with any criminal investigation," Item 7 does not contain such a restriction. April 12, 2017 FOIA Request 3.

exemption, courts in this circuit have generally required the government to satisfy a two-part inquiry, by showing "that the records contain law-enforcement techniques and procedures that are generally unknown to the public . . . [and that] disclosure could reasonably be expected to risk circumvention of the law." *Elkins v. Fed. Aviation Admin.*, 134 F. Supp. 3d 1, 4 (D.D.C. 2015) (quoting *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 245 (D.D.C. 2013)).

While RCFP relies on this two-part test, Defendants point to a different standard. Defendants first argue that the phrase "if such disclosure could reasonably be expected to risk circumvention of the law" in Exemption 7(E) should only apply to guidelines, and not to techniques and procedures. Defs.' Mem. Supp. 10 (citing *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010)). Defendants represent that courts are divided on the issue, but that "[t]he better reasoned decisions" have followed the Second Circuit in finding Exemption 7(E) to "categorically" protect records that would reveal law enforcement techniques or procedures not known to the public, regardless of the risk of harm. Defs.' Mem. Supp. 10. RCFP points out in response that the circuit split on the issue is between the Second Circuit and the *D.C. Circuit*, which has applied the "circumvention of the law" requirement both to guidelines and to techniques and procedures, and which Defendants conveniently ignore in their briefs. *See* Pl's Mem. Supp. 16 n.10 (citing *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)).

Second, Defendants argue that RCFP's standard is "erro[neous] on the law" because Exemption 7(E) can also protect records from disclosure even when a law enforcement technique or procedure is generally known to the public. Defs' Reply 3. Defendants argue that courts, including in this circuit, have allowed records to be withheld pursuant to Exemption 7(E) even

for known techniques or procedures when "disclosure could reduce or nullify their effectiveness." *Id.* at 3 (quoting *Petrucelli v. U.S. Dep't of Justice*, 51 F. Supp. 3d 142, 171 (D.D.C. 2014)).

The Court first reviews whether the impersonation of documentary filmmakers is a technique generally unknown to the public. Because the technique is publicly known, the FBI's *Glomar* response declining to acknowledge the existence or absence of records relating to it under Exemption 7(E) fails at the first step and the Court need not address whether unknown techniques and procedures are categorically protected under Exemption 7(E).[5] The Court next reviews whether revealing the existence or absence of records relating to the impersonation of documentary film workers in other contexts than the investigation of the Bundy standoff could "reduce or nullify" the technique's effectiveness. The Court concludes that it would not, and therefore that the FBI's *Glomar* response is inappropriate even under that broader standard.

1. Public Knowledge of Law Enforcement Impersonation of Documentary Film Workers

The Court first addresses whether the impersonation of documentary filmmakers and film crews is an investigation technique not known to the public. Because of the intense publicization of the Bundy standoff and of the government's subsequent criminal investigation and prosecution, the Court finds that it is not.

In its motion for partial summary judgment, RCFP argues that the investigation technique at issue in this case is publicly known for two reasons. RCFP first contends that the

---

[5] The Court briefly points out that the D.C. Circuit "has applied the 'risk circumvention of the law' requirement both to records containing guidelines and to records containing techniques and procedures," *Pub. Emps. for Envtl. Responsibility v. Int'l Boundary Water Comm'n* ("*PEER*"), 740 F.3d 195, 204 n.4 (D.C. Cir. 2014). The D.C. Circuit acknowledged its conflict with the Second Circuit in *PEER*. *See id.* The Court would accordingly be hard-pressed to adopt the Second Circuit's reading of Exemption 7(E) in this case, notwithstanding Defendants' assertion that "[t]he better reasoned decisions" have disagreed with the D.C. Circuit on the issue, given that this Court is bound by D.C. Circuit precedent.

14

impersonation of documentary film workers is a type of impersonation of news media, and that impersonation of news media has been a widely known law enforcement technique for decades. *See* Pl's Mem. Supp. 14.  Second, RCFP argues that the impersonation of documentary film workers as a separate law enforcement technique is also publicly known because the FBI released guidelines regarding the technique's use and because of the revelations and media attention generated by the Bundy standoff prosecutions.  *Id.* at 14–15.

Defendants conclusorily assert in their motion for summary judgment that the records sought would reveal an unknown law enforcement technique.  Defs' Mem. Supp. 11, 14; Hardy Decl. ¶ 30.  In their response to RCFP's motion, Defendants argue that RCFP's focus on the impersonation of news media is a "blatant straw man" because documentary film workers are distinct from members of the news media.  Defs.' Reply 3.  And Defendants argue that the technique is still unknown to the public because its use has never been acknowledged publicly outside of the Bundy standoff investigation.  *Id.* at 4.  The Court disagrees.

As an initial matter, the Court is not entirely convinced by Defendants' arguments regarding the impersonation of news media.  There may be some truth to the notion that "[a] documentary filmmaker is distinct from a member of the news media," Defs' Reply 3, but Defendants provide no authority to support that proposition.[6]  And while the FBI's guidance on the issue explicitly differentiates between the impersonation of news media and documentary filmmakers, *see* FBI Guidelines 91, RCFP points to the First Amendment context, where

---

[6] In its broadest definition, several dictionaries define news as the reporting of any matter that is noteworthy.  *E.g.* News, Oxford Dictionary, https://en.oxforddictionaries.com/definition/news; News, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/news.  Under such a definition, it would be entirely possible for all documentaries to qualify as news, and thus for documentary film workers to qualify as members of the news media.

documentary filmmakers have consistently benefited from the journalist privilege.[7]  *See* Pl's Reply at 8.  At a minimum, Defendants appear to recognize that at least *some* documentary film workers are members of the news media.  *See* Defs.' Reply 3 ("Documentary filmmakers may or may not be members of the news media, and not all members of the news media are documentary filmmakers.").  This leaves unclear how the impersonation of documentary filmmakers as a whole can be a secret technique when the impersonation of news media is not.

In any event, the Court need not grapple with the semantics of what constitutes "news media" because it finds that the impersonation of documentary film workers is itself a known law enforcement technique.  The government's public revelation that it had impersonated a documentary film crew to investigate Bundy and his supporters was widely disseminated in the media and triggered follow-up reports covering the details of the operation.  *See, e.g.*, Devereaux & Aaronson, *America Reloaded*.  Defendants argue that the technique is not well-known "outside the single publically acknowledged instance in the *Burleson/Bundy* case," Defs.' Reply 4, but that is all that is needed in order for the technique itself to become known.  The Court agrees with RCFP that it is implausible for Defendants to assert the technique is secret simply because it has only been acknowledged to have been used in one instance.  What other situations the technique may have been used in is still a secret, but the fact that it is a technique law enforcement uses is not, and Defendants accordingly cannot justify the FBI's *Glomar* response on the grounds that revealing whether documents exist would disclose an unknown law enforcement technique.

---

[7] RCFP also argues that the FBI's guidelines on the impersonation of news media apply to the impersonation of documentary film workers.  *See* Pl.'s Reply 5.  But the guidelines repeatedly refer to procedures that apply when "FBI employees represent, pose, or claim to be members of the news media *or* a documentary film crew."  *E.g.* FBI Guidelines 92 (emphasis added).  The fact that the guidelines explicitly differentiate between the two suggests that the FBI does not consider documentary filmmakers to be included as part of news media.

2. Whether Acknowledging Records Would "Reduce or Nullify" the Technique's Effectiveness

The Court next reviews Defendants' argument that records relating to a technique that is already known to the public can still be withheld under Exemption 7(E) if disclosure could "reduce or nullify" the effectiveness of the technique. Defs' Reply 2–3 (quoting *Petrucelli*, 51 F. Supp. 3d at 171). The Court is not entirely convinced that the line of cases cited by Defendants sets out a different standard from that articulated by RCFP.[8] But in any event, the Court finds that Exemption 7(E) does not warrant a *Glomar* response here because disclosing the existence or nonexistence of records relating to the impersonation of documentary film workers would not reduce or nullify the effectiveness of the technique. Defendants do not specifically argue that disclosure here would "reduce or nullify" the effectiveness of the technique, but extensively argue that such disclosure would risk circumvention of the law. Because those arguments are analogous, the Court considers them.

Defendants argue that a *Glomar* response is necessary to prevent a reasonable risk of circumvention of the law for two reasons. First, they contend that disclosing law enforcement's impersonation of documentary film workers in contexts other than the Bundy standoff

---

[8] Cases in this circuit to consider whether records disclosure could "reduce or nullify" the effectiveness of a technique or procedure have involved circumstances where a technique or procedure was generally known, but where details of the technique or procedure's application were still secret. *E.g. Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (allowing withholding of records describing the details of security clearance procedures, polygraph examinations, and drug investigatory techniques, even when techniques were publicly known to some extent); *Coleman v. FBI*, 13 F. Supp. 2d 75, 83 (D.D.C. 1998) (allowing withholding of records relating to personality profiles developed by FBI's Behavioral Science Unit even when the underlying technique was publicly known); *see also, e.g.*, *Bishop v. U.S. Dep't of Homeland Sec.*, 45 F. Supp. 3d 380, 391 (S.D.N.Y. 2014) (citing cases to support proposition that details of investigatory technique can still be withheld when technique itself is known). All these cases involved the assertion of Exemption 7(E) to withhold records referencing parts of a technique or procedure, or context and circumstances in which the technique or procedure is utilized, that were unknown to the public, and the disclosure of which could have reasonably risked circumvention of the law by reducing or nullifying the effectiveness of the technique or procedure as a whole.

17

investigation "would allow criminals to reasonably discern whether or not the FBI has employed this technique to investigate their own criminal activity." Defs' Mem. Supp. 11–12. This would in turn allow criminals to "predict FBI investigative efforts targeting their activities, thereby allowing them to pre-emptively destroy or tamper with valuable evidence, intimidate or eliminate potential witnesses, and create false alibis," as well as "embolden some criminals to continue ongoing criminal activity" if the FBI has not used the technique against them. *Id.* at 12. Second, Defendants argue that acknowledging the existence or absence of records would provide criminals with "key information about the frequency of the technique's use," which in turn would allow criminals to "alter their patterns of behavior, areas of operation, contacts, and other behaviors to circumvent FBI undercover operations," as well as to "judge whether they should completely avoid any contacts with documentary film crews." *Id.* RCFP retorts that simply indicating whether records responsive to the request exist would not trigger the harms Defendants describe. Pl's Mem. Supp. 16–19. RCFP further argues that the "reduce or nullify" standard has only been applied in non-*Glomar* cases and is inapplicable to the situation here. The Court agrees.

On their face, none of Defendants' arguments support the conclusion that revealing whether the FBI has records relating to additional instances of law enforcement impersonation of documentary film workers would reduce or nullify the effectiveness of the technique. Simply revealing that the FBI has any such records would not allow criminals to discern whether or not the FBI has used the technique to investigate their own, specific criminal activity, because all a criminal would know is the existence of an unquantified number of records. For the same reason, acknowledging the existence of records, without any indication about the number or type of records found, would not provide any information about the frequency of the technique's use.

Revealing that the FBI does not have any responsive records would conclusively establish that the FBI has not used the technique outside of the Bundy investigation since 2010, which might well "embolden some criminals to continue ongoing criminal activity," Defs' Mem. Supp. 12.[9] And revealing that the FBI has responsive records would establish that it has used the technique at least once more, suggesting that the Bundy standoff investigation was not an isolated, one-off case. But given the information already publicly available to criminals, this would not reduce or nullify the effectiveness of the technique when it is actually used.

With the information already in the public sphere, criminals can already discern that the FBI has used the technique in the past—with the extensive media coverage of the Bundy standoff investigation even yielding information on various missteps made by FBI agents when using the technique, *see* Devereaux & Aaronson, *America Reloaded* 28 (describing the poor filmmaking techniques used by FBI agents during Operation Longbow and noting that "[h]ad [the suspects] known anything about filmmaking, the FBI's on-camera interviews would have blown their cover"). While former FBI director James Comey described the impersonation of news media as a "rare" and "unusual" technique in 2014, he also acknowledged that deception in undercover operations "has long been a critical tool in fighting crime." Letter from James Comey to the Editor of the New York Times 2. And criminals can further determine that the FBI has gone through the effort of issuing detailed guidance on the impersonation of documentary filmmakers and crews. *See generally* FBI Guidelines.

---

[9] Even then, such a disclosure would not conclusively establish that no law enforcement agency has used the technique since 2010. It is thus unclear that a hypothetical criminal who was approached by a documentary film crew seeking to discuss his or her criminal activity in the past nine years would necessarily conclude from the FBI's disclosure that the film crew was legitimate, rather than a law enforcement agency, either federal or local, other than the FBI.

This publicly available information suggests that the impersonation of documentary film workers in the Bundy standoff investigation was not an isolated instance, and that the FBI has either used the technique elsewhere, or may use it elsewhere.  Accordingly, with the information available today, a criminal approached by purported documentary film workers pitching an upcoming project would already be able to conclude that the film workers are unlikely to be FBI agents, but that they could be.  The FBI does not explain how the existence or absence of additional documents would change this calculus at all in the criminal's decision as to what to do.

Ultimately, the Court agrees with RCFP that the type of disclosure sought to be prevented by the FBI's *Glomar* response would not reduce or nullify the effectiveness of law enforcement impersonation of documentary film workers.  Unlike in *Petrucelli*, which involved the invocation of Exemption 7(E) to withhold specific records relating to a law enforcement technique, here the exemption is used to withhold the potential existence of any such records in the first place.  The Court does not see how disclosing whether any records exist could reduce or nullify the technique's effectiveness.  The determination of whether disclosure of any information in the documents sought could cause harm must be made utilizing the standard FOIA tools applied on a document-by-document basis.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment (ECF No. 19) is **DENIED** and Plaintiff's cross-motion for partial summary judgment (ECF No. 21) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 1, 2019                                              RUDOLPH CONTRERAS
                                                                               United States District Judge