**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| REPORTERS COMMITTEE FOR | : | | |
| FREEDOM OF THE PRESS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 17-1701 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 47, 49, 50 |
| | : | | |
| FEDERAL BUREAU OF | : | | |
| INVESTIGATION *et al.*, | : | | |
| | : | | |
| Defendant. | : | | |

## <u>MEMORANDUM OPINION</u>

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT, DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND
DENYING PLAINTIFF'S MOTION FOR *IN CAMERA* REVIEW**

## I. INTRODUCTION

Concerned about law enforcement going undercover to impersonate journalists and

documentary filmmakers, Plaintiff Reporters Committee for Freedom of the Press seeks records

relating to the practice from the Federal Bureau of Investigation. In response to the Committee's

Freedom of Information Act ("FOIA") request, the Bureau disclosed some redacted documents

and withheld others completely. It says it has discharged its obligations under FOIA. The

Committee disagrees. For the most part, the Bureau is right. It has adequately justified its

withholdings for all but one group of the disputed records. With respect to that group of records,

the agency must provide a better explanation.

## II. BACKGROUND

As discussed in the Court's previous opinion in this case, the Committee's lawsuit has its

origins in a series of news events that brought public attention to law enforcement's practice of

impersonating journalists and documentary filmmakers. *See Reps. Comm. for Freedom of Press v. FBI (Reps. Comm. I)*, 369 F. Supp. 3d 212, 215–217 (D.D.C. 2019). The most prominent of those events involved an armed standoff between federal law enforcement officers and Nevada cattle rancher Cliven Bundy. *See id.* at 216. During the subsequent prosecution of Bundy and his supporters, the federal government revealed that FBI agents posed as documentary filmmakers to lure suspects into speaking with them. *Id.* at 216–17.

Media coverage of the Bureau's undercover operation—called "Operation Longbow"—prompted the Committee to request information about the filmmaker impersonation tactic. *See id.* at 217. Its FOIA request sought eight kinds of records. *See* Defs. Statement of Material Facts as to Which There Is No Genuine Issue ("Defs.' SMF") ¶ 1, ECF No. 47-2. Items 1 through 5 of the request asked for records pertaining to the Bundy standoff. *Id.* Items 6 through 8 were framed more broadly. They requested:

(6)    All records, including but not limited to, email communications, concerning or referencing any other instances of impersonation of a documentary filmmaker and/or a documentary film crew by the FBI in connection with any criminal investigation since January 1, 2010;

(7)    Records of any "professional credentials, websites and business cards" used by FBI agents in connection with the impersonation of a documentary filmmaker and/or a documentary film crew since January 1, 2010; and

(8)    All records of the FBI's policies and practices concerning the impersonation of documentary filmmaker and/or documentary film crew since January 1, 2010, including records of any changes to those policies and practices.

*Id.* These last three items are at the center of the parties' current dispute.

When the Committee's attempts to get records directly from the Bureau failed, it filed this FOIA suit. *See Reps. Comm. I*, 369 F. Supp. at 218. The Bureau initially refused to confirm

or deny the existence of any records responsive to items 6 and 7 (other than those dealing with the already-public Bundy investigation). *See id.* It argued that disclosure of any information related to the Committee's request would reveal information about a law enforcement technique that would lessen that technique's effectiveness. *Id.* at 219. The Court disagreed, *see id.* at 225, so the Bureau began searching for responsive records, *see, e.g.*, Joint Status Report, ECF No. 30.

The Bureau's search uncovered "approximately 125,000 pages and approximately 200 audio/video files potentially responsive to items 6 and 7," 4th Seidel Decl. ¶ 21, ECF No. 47-3, as well as 28 pages responsive to item 8, *id.* ¶ 25. Although the agency released a small portion of these records to the Committee, it withheld most of them under various exemptions to FOIA's general disclosure requirement. *See id.* ¶¶ 21–23, 27.

Whether the Bureau properly withheld the records that it did is at issue today. It moves for partial summary judgment, asserting that it has satisfied its obligations under FOIA for items 6 through 8 of the Committee's request. *See* Defs.' Mot. Partial Summ. J. ("Defs.' Mot."), ECF No. 47-1; *see also* Defs.' Combined Reply and Opp'n, ECF No. 53. The Committee counters with a motion for partial summary judgment of its own, challenging various aspects of the Bureau's disclosure as inadequate. *See* Pl.'s Mem. Opp'n Defs.' Mot. Partial Summ. J. and Supp. Pl.'s Cross-Mot. Partial Summ. J. ("Pl.'s Mot."), ECF No. 49-1. It also asks the Court to review a sample of the disputed records *in camera* to verify the Bureau's exemption claims. *See* Pl.'s Mem. Supp. Mot. *In Camera* Review ("Pl.'s *In Camera* Mot."), ECF No. 50-1; *see also* Pl.'s Reply Supp. Cross-Mot. Partial Summ. J. and Mot. *In Camera* Review ("Pl.'s Reply").

For the reasons stated below, the Court grants in part and denies in part the Bureau's motion and denies both of the Committee's motions. The Bureau properly withheld most of the records in dispute. Nevertheless, it did not adequately justify withholding one category of

records.  The agency will have another chance to do so.  In addition, *in camera* review of a sampling of the withheld records is not necessary at this time.

### III.  LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Because resolving a FOIA claim generally entails applying law to undisputed facts, "FOIA cases typically and appropriately are decided on motions for summary judgment." *See Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).

The Freedom of Information Act "was designed 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'"  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  Put simply, it "mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011).  Because FOIA embodies a general policy of disclosure, however, the exemptions must "be given a narrow compass." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just. (CREW)*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (internal quotation marks omitted) (quoting *Milner*, 562 U.S. at 571).  For the same reason, "[t]he agency bears the burden of establishing that a claimed exemption applies." *Id.* And even then, the recently enacted FOIA Improvement Act requires an agency to disclose an exempted record unless it can also show that it "reasonably foresees that disclosure would harm an interest protected by [the] exemption" or that "disclosure is prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i); *see also Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020); *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 486 F. Supp. 3d 317, 335 (D.D.C. 2020).

An agency carries its burden at summary judgment "by submitting affidavits that 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *CREW*, 746 F.3d at 1088 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Agency affidavits can "take the form of a '*Vaughn* index,' but there is 'no fixed rule' establishing" what they "must look like." *Id.* (citations omitted). An agency may offer declarations from agency officials, *Vaughn* indices, the requested records *in camera*, or a combination of some or all those sources. *See Tax Analysts v. IRS*, 410 F.3d 715, 720 (D.C. Cir. 2005); *see also ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013) ("[A] district court has considerable latitude to determine [a *Vaughn* index's] requisite form and detail in a particular case."). What matters is that the agency materials "give the reviewing court a reasonable basis to evaluate the claim of privilege." *ACLU*, 710 F.3d at 433 (quoting *Gallant v. NLRB*, 26 F.3d 168, 173 (D.C. Cir. 1994)).

Usually, an agency must "provide the requestor with a description of each document being withheld[] and an explanation of the reason for the agency's nondisclosure." *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). But when "the FOIA litigation process threatens to reveal 'the very information the agency hopes to protect,'" the agency may limit the information in its affidavits to just "'brief or categorical descriptions' of the withheld information." *CREW*, 746 F.3d at 1088 (quoting *ACLU*, 710 F.3d at 432). In that circumstance, the agency can "justify withholding or redacting records 'category-of-document by category-of-document' rather than 'document-by-document.'" *Am. Immigr. Lawyers Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 675 (D.C. Cir. 2016) (quoting *CREW*, 746 F.3d at 1088).

Finally, an agency that withholds requested information "must demonstrate that it cannot segregate the exempt material from the non-exempt and disclose as much as possible." *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 74 (D.D.C. 2003); *see also* 5 U.S.C. § 552(b); *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."). It can satisfy that obligation by explaining with "reasonable specificity" why it cannot segregate the requested documents further. *See Ctr. for Pub. Integrity v. U.S. Dep't of Com.*, 401 F. Supp. 3d 108, 116 (D.D.C. 2019) (quoting *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008)). A "blanket declaration" of nonsegregability is not enough. *See Wilderness Soc. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 19 (D.D.C. 2004). When an agency offers a sufficient explanation, however, courts presume that it has disclosed what it needs to unless there is reason to suspect otherwise. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007); *see also Ctr. for Public Integrity*, 401 F. Supp. 3d at 116–17.

## IV.  ANALYSIS

The Bureau has largely satisfied its disclosure obligations under FOIA. As explained below, the records at issue consist of five sets. The Bureau properly withheld two sets in full and two sets in part. It needs to do no more to keep those records from the Committee. When it comes to the final set, however, the Bureau's justification for categorically withholding the records falls well short of what FOIA requires. The agency will have to do better to show that it is entitled to withhold that last group of records.

### A.  The Records at Issue

Before getting into the Committee's challenges and the Bureau's exemption claims, it is helpful to summarize the records in dispute. They fall into five sets.

Four sets are responsive to items 6 and 7 of the Committee's request.  One consists of records that relate to investigations in which the Bureau has not publicly acknowledged using the filmmaker technique.  4th Seidel Decl. ¶ 23.  The Bureau explains that these documents contain detailed information about undercover filmmaker operations, including requirements for authorization, how agents use the technique, and when agents might use the technique over others.  *Id.* ¶ 36.  That is as specific as the agency gets.  Citing concerns that revealing the scope of the technique's use could jeopardize law enforcement efforts, the Bureau refuses to say in public court filings how many pages are even responsive to the Committee's request.  *Id.* ¶¶ 23, 31–36.  It has instead provided a declaration and a *Vaughn* index to the Court for *in camera* review (both of which the Court will discuss further below).  *Id.* ¶ 36.  The agency claims that Exemption 7(E) permits it to withhold from the Committee not only the volume of responsive documents and the descriptive information typically provided in a *Vaughn* index, but also the documents themselves in full.  *Id.* ¶ 32.  In addition to that categorical claim, the Bureau asserts that a variety of exemptions—Exemptions 1, 3, 5, 6, 7(C), 7(D), 7(E), and 7(F)—protect the contents of the documents from disclosure.  *See id.* ¶¶ 30, 37.

The other three sets of records responsive to items 6 and 7 relate to two investigations in which the Bureau admitted that agents posed as filmmakers (including the Bundy investigation).  Collectively, these records consist of 90 pages of documents.  *See id.* ¶¶ 21–22, 38.  The first set includes 10 pages that the Bureau released to the Committee in part.  *See* 2d Townsend Decl., Ex. N, ECF No. 49-3.  The 10 pages comprise electronic communications to and from the FBI's Cleveland Field Office concerning a proposed undercover operation.  *See id.*; *see also* Defs.' Combined Reply and Opp'n, Ex. A ("Public *Vaughn* Index"), ECF No. 53-3; 4th Seidel Decl. ¶ 86.  They are heavily redacted.  *See* 2d Townsend Decl., Ex. N.  A reader can determine only

that the proposal involved a 2010 homicide and relied on information from a confidential informant.  *See id.*  By each redaction, the Bureau noted which exemptions it believed should apply.  *See id.*  It claimed Exemptions 5, 6, 7(C), 7(D), and 7(E).  *See id.*

The Bureau withheld the next two records sets—together consisting of 80 pages—in full. 4th Seidel Decl. ¶¶ 22, 38.  For 26 of those pages, it provided the Committee a table listing which exemptions applied to each page.  *See* 2d Townsend Decl., Ex. N.  It claimed Exemptions 6, 7(D), and 7(E).  *See id.*  The Bureau's public *Vaughn* index makes clear that the 26 pages are part of the same file as the 10 Cleveland Field Office communications.  *See* Public *Vaughn* Index.  Other than that, the most the Bureau's public filings reveal about the 26 pages is that they comprise two 13-page documents, each of which claims the same exemptions on the same pages as the other.  *See id.*  The Bureau withheld the remaining 54 pages "categorically" under Exemption 7(A) and "other underlying exemptions."  4th Seidel Decl. ¶ 38.  The 54 pages pertain to the Bundy investigation.  Bender Decl. ¶ 7.

Finally, one set of records consists of 28 pages that are responsive to item 8 of the Committee's request.  These pages "includ[e] four revisions of the policy titled *Undercover Activities: Posing as a Member of the News Media or a Documentary Film Crew*."  4th Seidel Decl. ¶ 25.  Each of the four versions is substantively identical (the only differences are the dates the agency last reviewed and renewed them).  *See* Bender Decl. ¶ 25; *see also* 2d Townsend Decl., Ex. M.  The Bureau released the policy documents with some redactions, but, unlike the Cleveland Field Office communications, it left most of the policy's language unobscured.  *See* 2d Townsend Decl., Ex. M.  Alongside each redaction is a code indicating in general terms why the agency withheld the omitted information under Exemption 7(E).  *See id.*

Below is a summary table of the records at issue:

| Request Items | Description of Records | Claimed Exemptions |
|---|---|---|
| 6 and 7 | <u>Nonpublic uses of technique</u><br>    Undisclosed number of pages withheld<br>    in full, categorically | Categorical exemption: 7(E)<br>    Underlying exemptions: 1, 3, 5,<br>    6, 7(C), 7(D), 7(E), 7(F) |
| | <u>Public uses of technique</u> (90 pages)<br>    10 pages withheld in part, redacted<br>    26 pages withheld in full, page-by-page<br>    54 pages withheld in full, categorically | 5, 6, 7(C), 7(D), 7(E)<br>6, 7(D), 7(E)<br>Categorical exemption: 7(A)<br>    "Other underlying exemptions" |
| 8 | <u>Impersonating Filmmakers Policy</u><br>    28 pages withheld in part, redacted | 7(E) |

### B. Exemption 7

The Court begins and ends its discussion with Exemption 7. It agrees with the Bureau that Exemption 7 protects from disclosure four of the records sets the Committee has requested. The Bureau says that Exemption 7 permits it to withhold the fifth set of records too, but its explanation is lacking. It will have another opportunity to justify withholding that last set of records. For now, the Court does not need to look to other exemptions.

Exemption 7 includes six related exemptions within its umbrella. *See* 5 U.S.C. § 552(b)(7). Their common denominator is a threshold requirement that the "records or information" sought must be "compiled for law enforcement purposes." *Id.* It is unquestioned that the records at issue here satisfy that requirement. The FBI created the documents responsive to items 6 and 7 of the Committee's request in the course of law enforcement investigations. *See Reps. Comm. I*, 369 F. Supp. 3d at 220 (holding that the Bureau made the threshold showing for records responsive to items 6 and 7). And the policies that request item 8 seeks are agency

records documenting "guidelines, techniques, sources, and procedures" meant to govern those kinds of investigations. *See Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002) (explaining that internal policies put together outside the context of a specific investigation may still serve law enforcement purposes).

Rather than debate Exemption 7's threshold requirement, the parties' disputes revolve around its subsidiary exemptions. The Court begins with Exemption 7(E) because it covers most of the information the Bureau withholds. The Court then moves on to Exemption 7(A), which the Bureau invokes for the rest.

### 1. Exemption 7(E)

Exemption 7(E) allows agencies to withhold law enforcement information "only to the extent that" it "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The exemption "does not ordinarily protect 'routine techniques and procedures already well known to the public,'" but it does "protect 'confidential details . . . of program[s]' if only their 'general contours [are] publicly known.'" *Elec. Frontier Found. v. Dep't of Just.*, 384 F. Supp. 3d 1, 9–10 (D.D.C. 2019) (omission and alterations in original) (first quoting *Founding Church of Scientology of Wash., D.C. v. NSA*, 610 F.2d 824, 832 n.67 (D.C. Cir. 1979); and then quoting *Sussman*, 494 F.3d at 1112).

There is no dispute that agents impersonating filmmakers is a law enforcement technique. *Reps. Comm. I*, 369 F. Supp. 3d at 220. Nor is there any dispute that the policy governing the use of that technique is a "guideline" for Bureau investigations. *See* Bender Decl. ¶ 25 (explaining that the Bureau "actively utilize[s]" the policy "in its planning and execution" of

investigations). As a result, the key question is whether disclosure of the withheld information "could reasonably be expected to risk circumvention of the law."[1]

That standard "sets a relatively low bar for the agency to justify withholding." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011). As the D.C. Circuit has said:

> [T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.

*Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). Ultimately, the agency need only "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Id.* at 1194 (cleaned up) (quoting *PHE, Inc. v. Dep't of Just.*, 983 F.2d 248, 251 (D.C. Cir. 1993)). And that showing is not a "highly specific" one. *Id.* Finally, "circumvention of the law" means "that a law will be violated or that past violators will escape legal consequences." *Id.* at 1193.

Contrary to what the Committee says, the FOIA Improvement Act does not heighten the exemption's substantive standard. *See* Pl.'s Mot. at 36–37; Pl.'s Reply at 14–16. For one thing, applying a higher foreseeability bar "would mean ignoring the D.C. Circuit's precedents defining" Exemption 7(E)'s scope. *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, No. 20-cv-1400, 2021 WL 950415, at *6 (D.D.C. Mar. 12, 2021). This Court "leav[es] to [the D.C. Circuit] the prerogative of overruling its own decisions." *Brookens v.*

---

[1] There is some debate among courts of appeals as to whether Exemption 7(E)'s "circumvention" clause applies to "techniques and procedures" like it does to "guidelines." *See Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*, 740 F.3d 195, 205 n.4 (D.C. Cir. 2014). The D.C. Circuit applies the clause to both kinds of records, so this Court does too. *See Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011); *see also Shapiro v. U.S. Dep't of Just.*, 239 F. Supp. 3d 100, 119 (D.D.C. 2017).

11

*Acosta*, 297 F. Supp. 3d 40, 49 (D.D.C. 2018) (second alteration in original) (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)), *aff'd*, No. 18-5129, 2018 WL 5118489 (D.C. Cir. Sept. 19, 2018). And the Circuit has continued to apply its pre–FOIA Improvement Act caselaw in the Exemption 7(E) context since the law's enactment. *See, e.g.*, *Garza v. U.S. Marshals Serv.*, No. 18-5311, 2020 WL 768221, at *1 (D.C. Cir. Jan. 22, 2020). For another thing, Exemption 7(E)'s text "already contained an explicit requirement that the agency show a reasonable nexus between the withheld information and a predicted harm." *Citizens for Resp. & Ethics in Wash.*, 2021 WL 950415, at *6 n.4. To the extent the standards of Exemption 7(E) and the FOIA Improvement Act conflict, the one specific to Exemption 7(E) should control. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("[A] statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.").[2]

With that background out of the way, the Bureau invokes Exemption 7(E) for four sets of records: (1) all the records relating to nonpublic uses of the filmmaker technique; (2) nearly all the information redacted from the Cleveland Field Office communications; (3) each of the 26 pages related to publicly acknowledged uses of the technique that the Bureau withheld in full; and (4) all the information redacted from the Bureau's undercover filmmaker policy. The Court addresses each in turn. While discussing how Exemption 7(E) applies to the first set of records,

---

[2] As another district court in this Circuit noted, "[t]his analysis does not turn the FOIA Improvement Act into mere surplusage." *See Citizens for Resp. & Ethics in Wash.*, 2021 WL 950415, at *6 n.4. The Act retains its bite when an agency claims other exemptions that lack a foreseeability requirement. *See id.* ("The effects of the FOIA Improvement Act are perhaps most strongly felt in cases involving the deliberative process privilege under FOIA Exemption 5."); *see also Ecological Rts. Found. v. U.S. EPA*, No. 19-cv-980, 2021 WL 535725, at *32 (D.D.C. Feb. 13, 2021) ("[T]he agency's burden to demonstrate that harm would result from disclosure may shift depending on the nature of the interests protected by the specific exemption with respect to which a claim of foreseeable harm is made.").

the Court also assesses whether the exemption allows the Bureau to submit *in camera* affidavits (in addition to the public ones it provided) to justify its withholdings.

  *a. Records Relating to Nonpublic Uses of the Technique and the Bureau's* In Camera *Affidavits*

To begin, the Bureau claims that Exemption 7(E) covers all the records it found that relate to investigations where it has not publicly acknowledged using the filmmaker technique. 4th Seidel Decl. ¶ 23. Its public declarations provide an overview of those records. They state:

> The exempt in full records contain detailed information about specific requirements for undercover authorization, detailed information concerning the decision-making process for the FBI's decision to utilize this particular technique rather than many others available, the time frame during which the technique was to be employed, specifics about non-publicly known operation(s), specific details about the implementation of the technique, and information about expenses incurred in the use of the technique, among other things.

*Id.* ¶ 36; Bender Decl. ¶ 28. The declarations go on to explain that the records "consist of lA envelopes (FD-340), Electronic Communications ('ECs'), forms, electronic mail messages, Sentinel Import Form (FD-1036), FD-302s, FBI letters, and other evidentiary documents." 4th Seidel Decl. ¶ 36 n.8.[3] But that is the extent of the descriptive information the Bureau provides publicly. While it says its search uncovered "approximately 125,000 pages of records potentially responsive" to the Committee's requests, it does not disclose in public court filings how many of those pages are actually responsive. *Id.* ¶ 23. According to the Bureau, providing that number would "reveal the scope of the FBI['s] reliance on these techniques." *Id.* ¶ 32; *accord* Bender Decl. ¶ 27. And even more damaging to law enforcement efforts, the Bureau asserts, would be the release of details included in a typical *Vaughn* index, such as dates, geographical information, and document descriptions. 4th Seidel Decl. ¶¶ 32–36; *accord* Bender Decl. ¶ 27–

---

[3] Sentinel is the Bureau's "next generation case management system" that documents electronically "all FBI generated records . . . in case files." 4th Seidel Decl. ¶ 12,

30.  It argues that wrongdoers could piece together that information to ascertain "the scope of the FBI's reliance on the [filmmaker] technique (or lack thereof) by geographical area and the targets and[/]or types of investigations in which the technique is most effectively used."  Bender Decl. ¶ 27.  Supposedly, wrongdoers could then "alter their patterns of activity, geographic areas of operations, contacts, and other behaviors in efforts to circumvent FBI detection."  *Id.* ¶ 30.

The sensitive details the Bureau conceals are in the classified declaration and *Vaughn* index it submitted *ex parte* for *in camera* review.  *See* Notice of Lodging of Classified Decl. of Michael G. Seidel and Classified *Vaughn* Index for *Ex Parte*, *In Camera* Review, ECF No. 48.  The *in camera* declaration and index provide information on all the documents responsive to request items 6 and 7.  For each document, the *Vaughn* index provides a description of its contents along with a list of the FOIA exemptions the Bureau claims protect it from disclosure.  *See* Seidel Decl. ¶ 23.  The declaration offers context for the documents and supplies additional detail as to why they purportedly fall under the exemptions the Bureau says they do.  *See id.* ¶ 7.

"[T]he use of in camera affidavits has generally been disfavored" in this Circuit.  *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 580 (D.C. Cir. 1996).  Keeping an affidavit from a plaintiff makes it harder for the plaintiff to challenge summary judgment and deprives the court of a complete adverse perspective.  *Mobley v. Dep't of Just.*, 870 F. Supp. 2d 61, 69 (D.D.C. 2012).  Nevertheless, *in camera* inspection of an agency affidavit is warranted when it is necessary to evaluate an agency's exemption claims and a detailed description of the withheld documents would risk disclosing information the agency seeks to protect.  *Elec. Priv. Info. Ctr. v. U.S. Drug Enf't Agency*, 401 F. Supp. 3d 37, 44 (D.D.C. 2019); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 950 F. Supp. 2d 221, 235 (D.D.C. 2013); *see also Lykins v. U.S. Dep't of Just.*, 725 F.2d 1455, 1463 (D.C. Cir. 1984) (upholding *in camera* review

of a letter because "extensive public justification would threaten to reveal the very information for which a FOIA exemption is claimed"). Whether the circumstances call for an *in camera* affidavit "is at the discretion of the trial court." *Lykins*, 725 F.2d at 1465. But to minimize any "negative impact on the effective functioning of the adversarial system," a court that reviews an agency affidavit *in camera* must clearly state its reasons for doing so and ensure that as much of the affidavit as possible is made available to the opposing party. *Armstrong*, 97 F.3d at 580–81.

Similar to the standards governing *in camera* agency affidavits are those that apply to "no number, no list" responses like the one the Bureau issued for the publicly unacknowledged records. A no number, no list response is what it sounds like: it acknowledges that responsive documents exist but does not number them or provide other descriptive information about them. *ACLU*, 710 F.3d at 433. For such a response to be appropriate, it must be that "any description of [the responsive] documents would effectively disclose validly exempt information." *Id.* It could be that a no number, no list response is proper for some subset of responsive documents but not the remainder. *Id.* at 434. In any case, a no number, no list response is justified only "in unusual circumstances, and only by a particularly persuasive affidavit." *Id.* at 433.

Clearly, the inquiries for assessing the Bureau's *in camera* affidavits and its no number, no list response overlap significantly. Each requires determining whether high-level descriptions of the disputed records are themselves protected by an exemption. The Court therefore conducts both analyses concurrently.[4]

---

[4] Notably, the Bureau's *in camera* affidavits provide information on all the documents responsive to items 6 and 7 of the Committee's request—not just documents relating to nonpublic uses of the filmmaker technique. But even though the Bureau asserts a no number, no list response for only the publicly unacknowledged investigation records, its mosaic theory for keeping the high-level information in its *in camera* affidavits from the Committee applies equally to the records relating to publicly acknowledged uses of the technique. The Court can thus still evaluate the two issues at the same time. Because the Court ultimately finds that

The Bureau's rationale for withholding descriptive information about the disputed records rests on a mosaic theory. *See* Bender Decl. ¶ 30. "A mosaic theory posits that separate disclosures of otherwise innocuous information could be assembled by a requester or other person to reveal 'how, when, [and] under which circumstances[] certain techniques are employed' by law enforcement and investigative agencies." *Whittaker v. U.S. Dep't of Just.*, No. 18-cv-01434, 2020 WL 6075681, at *5 (D.D.C. Oct. 15, 2020) (quoting *Reps. Comm. for Freedom of the Press v. FBI*, No. 15-cv-1392, --- F. Supp. 3d ----, 2020 WL 1324397, at *11 (D.D.C. Mar. 20, 2020)). If Exemption 7(E) protects the full mosaic from disclosure, it also "shield[s] each individual piece" of the mosaic "to prevent anyone from constructing" it. *Id.*; *see also Citizens for Resp. & Ethics in Wash.*, 2021 WL 950415, at *4 ("[I]n some cases . . . Exemption 7(E) allows agencies to withhold data constituting 'part of a complex mosaic' that, if pieced together, would reveal law enforcement techniques, procedures, or guidelines." (citation omitted)). The theory "finds support in both Supreme Court and D.C. Circuit precedent recognizing that 'bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'" *Shapiro v. U.S. Dep't of Just.*, 239 F. Supp. 3d 100, 115 (D.D.C. 2017) (quoting *CIA v. Sims*, 471 U.S. 159, 178 (1985)).

The Bureau appropriately invokes a mosaic theory here. Forcing the agency to disclose even high-level information about the records of its uses of the filmmaker technique would reveal to wrongdoers how often, where, and when the agency uses the technique. There is little question that divulging an overview of the Bureau's use of the technique over the past eleven years would constitute the disclosure of a law enforcement technique or procedure for purposes

---

Exemption 7(E) permits the Bureau to file *in camera* affidavits, it will use those affidavits to gauge the agency's withholdings of all documents responsive to request items 6 and 7.

of Exemption 7(E).  *Cf. Whittaker*, 2020 WL 6075681, at *5 ("Plaintiff does not dispute that the

FBI's strategic allocation of resources qualifies as a law enforcement technique or procedure.");

*Shapiro*, 239 F. Supp. 3d at 118 ("Plaintiffs appear to concede that the FBI's 'investigative

priorities' qualify as 'techniques . . . for law enforcement' for purposes of Exemption

7(E) . . . .").  Nevertheless, the Committee asserts that the Bureau has not demonstrated that

releasing such an overview would risk circumvention of the law.  *See* Pl.'s Mot. at 30–40.

That position "understates just how low the threshold is to satisfy Exemption 7(E)'s

'circumvention of the law' requirement."  *Whittaker*, 2020 WL 6075681, at *5.  Remember, the

exemption requires only that an agency "demonstrate logically how the release of the requested

information *might* create a risk of circumvention of the law."  *Mayer Brown*, 562 F.3d at 1194

(emphasis added) (cleaned up) (quoting *PHE*, 983 F.2d at 251).  The Bureau has satisfied that

"relatively low bar."  *See Blackwell*, 646 F.3d at 42.  It makes sense that wrongdoers could

misuse information about where and in what circumstances the Bureau has used the filmmaker

technique over the past eleven years.  If a certain FBI field office is associated with a high

number of responsive documents, for instance, wrongdoers in that office's footprint may be more

cautious when approached by agents undercover as a film crew.  *See Shapiro*, 239 F. Supp. 3d at

120 ("[K]nowing that the FBI has historically focused its enforcement efforts in a particular

region . . . might aid a criminal in circumventing the law.").  Likewise, if it turns out that the

Bureau uses the technique most frequently when investigating a certain type of crime,

wrongdoers perpetrating that crime may be discouraged from speaking to agents posing as

filmmakers.  *Cf. id.* at 118 ("[A]ggregate information about the number of files or documents

that bear a designation for domestic terrorism/animal rights extremism may shed considerable

light on the overall resources that a particular office of the FBI has devoted, or is devoting, to

investigating related crimes.").  Furthermore, wrongdoers operating in a region or criminal

enterprise associated with a high number of responsive records could infer that the Bureau is

devoting significant resources to catching them and thus attempt to evade detection by relocating

their operations, shifting to a different type of crime, or lying low temporarily.  *See Whittaker*,

2020 WL 6075681, at *5–6.  Even releasing the total number of responsive records could give

wrongdoers an idea of how often the Bureau uses the filmmaker technique—and thus how much

effort they should put into avoiding it.  *Cf. James Madison Project v. Dep't of Just.*, 208 F. Supp.

3d 265, 286 (D.D.C. 2016) (upholding agency's no number, no list response under Exemption 5

because providing the number of responsive records would show "the level of importance"

agency lawyers attributed to the FOIA request's subjects, which was itself privileged information

protected by the exemption).  Although the Court cannot "assess with precision the likelihood

of" these harms, the Bureau has still "demonstrated *some* chance that disclosure . . . risks

circumvention of the law via a mosaic effect."  *See Whittaker*, 2020 WL 6075681, at *5.[5]

The Committee raises two main counterpoints, but neither is persuasive.  First, it suggests

that the disputed records may be so old that they would provide wrongdoers little insight into the

Bureau's current practices.  *See* Pl.'s Mot. at 35–36.  The Committee faults the Bureau for failing

to include any "information about the actual or relative age of . . . the records at issue."  *Id.* at 35.

---

[5] The Committee's contrary belief that the Bureau has not shown a risk of circumvention of the law may stem from its misunderstanding that the FOIA Improvement Act heightened the foreseeability showing an agency must make to claim Exemption 7(E).  *See, e.g.*, Pl.'s Mot. at 36–38.  Indeed, the Committee at one point complains that there must be little risk of wrongdoers evading the law because the Bureau failed to identify any fallout from the news coverage that publicized its use of the filmmaker technique during the Bundy investigation.  *Id.* at 34.  But as the Court explained earlier, the FOIA Improvement Act worked no change to Exemption 7(E)'s substantive standard.  *See supra* section IV.B.1.  All the exemption requires is that the information "could reasonably be expected to risk circumvention of the law," not that is has done so before.  *See* 5 U.S.C. § 552(b)(7)(E).

It relies on *Shapiro v. United States Department of Justice*, where a court acknowledged that knowing how the Bureau historically "focused its enforcement efforts . . . might aid a criminal in circumventing the law" but asked the agency to produce more information about the records because it was unclear "whether the relevant investigations are open, whether they closed in the past few years, or whether they closed decades ago." 239 F. Supp. 3d at 120. The Committee also cites another case where a court required Customs and Border Protection to release historical staffing statistics after recognizing that the agency's practices had "changed dramatically in recent months." *Fams. for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287, 299–300 (S.D.N.Y. 2011). Together, these cases indicate that information about an agency's historical law enforcement practices is unlikely to help wrongdoers circumvent the law if that information is outdated. But there is no reason to believe that is true of the information the Committee requested. Because the Committee sought only records generated since the start of 2010, Defs.' SMF ¶ 1, all the responsive records are of relatively recent vintage. *See* 4th Seidel Decl. ¶ 13 (describing the Bureau's search as limited to records created since January 1, 2010). And nothing suggests that the Bureau has meaningfully changed its use of the filmmaker technique over that time period. *See Citizens for Resp. & Ethics in Wash.*, 2021 WL 950415, at \*5. Indeed, the Committee presumably submitted its FOIA request not only to learn about the recent history of the filmmaker technique but also to "shed light" on the Bureau's current practice. *See* Pl.'s Mot. at 3.

The Committee next argues that, even if the Bureau can properly withhold information describing an investigation's location and subject-matter focus, there are other details that it can disclose without risking circumvention of the law. Pl.'s Mot. at 32. Not necessarily. Many of the details in the Bureau's *in camera Vaughn* index could easily serve as proxies for the kinds of

data that the Committee appears to concede are sensitive. When coupled with publicly available information such as news reports or press releases, details like the names of those involved in an investigation or the addresses of key locations could reveal which Bureau investigations included the use of the filmmaker technique. The same could be true for the date associated with a document if the document's description mentions a public event or investigatory milestone. And as the Committee admits, *see* Pl.'s Mot. at 36 n.6, even releasing the case numbers associated with each responsive document would reveal geographic and subject-matter-related information because that information is incorporated into the Bureau's file-numbering system. *See Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 159 (D.D.C. 2018) (approving withholding of FBI case numbers because they identified the agency's investigative interests); *see also Shapiro*, 239 F. Supp. 3d at 118 & n.5 (collecting cases where courts have found that file numbers revealed law enforcement techniques). The whole purpose of the mosaic theory is to guard against the misuse of pieces of these seemingly "innocuous" pieces of information that could "reveal 'how, when, [and] under which circumstances[] certain techniques are employed' by law enforcement and investigative agencies." *Whittaker*, 2020 WL 6075681, at *5.

In attacking the sufficiency of the Bureau's public affidavits, the Committee never quite says what additional information it wants. It suggests that the Bureau could have provided descriptions of the requested records without revealing sensitive information like an investigation's geographic focus. *See* Pl.'s Mot. at 32. But that is essentially what the Bureau's two public declarations do—albeit at a high level. *See CREW*, 746 F.3d at 1088 ("Agency affidavits sometimes take the form of a '*Vaughn* index,' but there is 'no fixed rule' establishing what such an affidavit must look like. '[I]t is the function, not the form, of the index that is important.'" (alteration in original) (citations omitted)). They explain that the withheld

documents contain, among other things, information about the requirements for authorizing a filmmaker operation, when the Bureau might use the filmmaker technique over others, and specific details about how agents used the technique in the field. 4th Seidel Decl. ¶ 36; Bender Decl. ¶ 28. The declarations also list in general terms the kinds of documents withheld: "1A envelopes (FD-340), Electronic Communications ('ECs'), forms, electronic mail messages, Sentinel Import Form (FD-1036), FD-302s, FBI letters, and other evidentiary documents." 4th Seidel Decl. ¶ 36; Bender Decl. ¶ 28. And the declarations explain at length why the information within the withheld documents fit within each of the exemptions the Bureau claims. 4th Seidel Decl. ¶¶ 42–163; Bender Decl. ¶¶ 31–66. When it comes to Exemption 7(E), the declarations break their explanations down further. For instance, they say that the documents contain information about how the Bureau collects information for certain kinds of investigations, 4th Seidel Decl. ¶¶ 133–34, the focuses and targets of specific investigations, *id.* ¶¶ 140–42, and details of undercover investigations (presumably those using the filmmaker technique), *id.* ¶ 149. The Committee does not grapple with any of these justifications for the withholdings. *See* Pl.'s Mot. at 29–40.

After reviewing the *in camera* declaration and *Vaughn* index, the Court concludes that the Bureau's public declarations accurately describe the withheld records. The Committee has presented no valid ground for second-guessing the agency's representations by conducting an *in camera* review of a sample of the records. *See Larson*, 565 F.3d at 870 ("If the agency's affidavits 'provide specific information sufficient to place the documents within the exemption category, if this information is not contradicted in the record, and if there is no evidence in the record of agency bad faith, then summary judgment is appropriate without *in camera* review of the documents.'" (citation omitted)). From the Court's careful review of all the Bureau's

affidavits, it appears that both the *in camera* affidavits and the records of nonpublic uses of the filmmaker technique contain sensitive information protected by Exemption 7(E). Because a wrongdoer could use even seemingly harmless details from those materials—individually or collectively—to gain insight into when, where, and how FBI agents use the technique, the Bureau justifiably withheld them categorically and in full.[6]

### b. The 10 Pages of Cleveland Field Office Communications

As described earlier, the Bureau released in part 10 pages of communications to and from its Cleveland Field Office regarding a proposed undercover operation. *See* 2d Townsend Decl., Ex. N; *see also* 4th Seidel Decl. ¶ 86. The released communications are heavily redacted, and there is a code by each redaction signifying what exemption the redaction relies on. *See* 2d Townsend Decl., Ex. N. Almost every redaction rests at least in part on Exemption 7(E).[7] More specifically, the codes indicate that the redactions omit information regarding agents' collection and analysis of information, the identity and location of FBI units, the focus of the investigation, the undercover aspects of the operation, the targets of the investigation and how agents surveilled

---

[6] Notably, Exemption 7(E) permits the Bureau to withhold all the records relating to nonpublic uses of the filmmaker technique even though it did not claim the exemption for a small number of those records on an individual basis. When an agency demonstrates that a mosaic of information is categorically exempt from disclosure, each tile in that mosaic falls under the relevant exemption's protective umbrella. *See Reps. Comm.*, 2020 WL 1324397, at *11 ("While any one piece of information might not compromise the FBI's techniques or procedures, pieces of information can be assembled—in mosaic fashion—to provide a framework to determine how, when, under which circumstances, certain techniques are employed." (cleaned up)); *Shapiro*, 239 F. Supp. 3d at 114–16 (approving the Bureau's argument that Exemption 7(E) protected records under a mosaic theory, even though the records "standing alone" would not necessarily "disclose protected law enforcement techniques or procedures").

[7] The sole exception is a section under the heading "Subjects." *See* 2d Townsend Decl. Ex. N. For that redaction, the Bureau claims Exemptions 6 and 7(C). *Id.* Accompanying codes signal that the redaction conceals the names or identifying information of third parties of investigative interest. *See id.*; 4th Seidel Decl. ¶ 103. The Committee does not challenge this withholding. *See* Pl.'s Mot. at 25 n.5.

them, and what payments agents made to implement investigative techniques. *See id.*; Public *Vaughn* Index.

The Bureau's declarations elaborate on the coded justifications. They explain that disclosing redacted information in the Cleveland Field Office communications would reveal details about how and when agents use the filmmaker and other techniques, which would allow savvy wrongdoers to "take countermeasures" to reduce their effectiveness. 4th Seidel Decl. ¶ 133; *see also id.* ¶¶ 149, 161. Likewise, the declarants assert that releasing nonpublic information about the focus of an investigation or how agents pursued an investigation's targets could give wrongdoers insight into the Bureau's intelligence-gathering capabilities, possibly jeopardizing similar efforts in the future. *Id.* ¶¶ 141, 146. In addition, the declarants argue that publicizing the names and locations of specialized FBI units involved in a specific operation could reveal what kinds of crimes and geographic areas the agency prioritizes. *Id.* ¶ 135. According to them, even disclosing how much the Bureau paid would give wrongdoers a glimpse of how it allocates its limited resources. *Id.* ¶ 150. With that kind of information, the declarants say, a wrongdoer could adjust his criminal activities to take advantage of Bureau "weaknesses." *Id.* ¶ 150.

Between the agency declarations and the redacted communications, the Bureau has established a logical connection between its redactions and would-be criminals' ability to circumvent the law. Revealing details as to how agents approached an investigation may very well create a risk that wrongdoers will exploit the information to violate the law or escape the consequences of doing so. Accordingly, the Bureau has passed the "relatively low bar" for withholding much of the communications under Exemption 7(E). In fact, nowhere does the Committee single out the 10 pages' redactions as inadequately supported.

The Committee instead challenges the Bureau's segregability assessment. *See* Pl.'s Mot. at 12–14. But the agency has done what FOIA requires. A review of the redacted documents supports the Bureau's assertion that it made "[e]very effort" to turn over segregable information. *See* 4th Seidel Decl. ¶ 38; *see also Sussman*, 494 F.3d at 1117 ("Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."). Although the 10 pages are heavily redacted, it is unsurprising that it would be difficult to parse out information that falls under headings like "Undercover Technique," "Confidential Human Sources," and "Budget." *See* 2d Townsend Decl., Ex. N; *see also Hodge v. FBI*, 764 F. Supp. 2d 134, 144 (D.D.C. 2011) (rejecting plaintiff's argument that redaction of "large chunks of material . . . evidences defendants' failure to segregate" because declarations and annotations "identif[ied] the exemptions claimed . . . for each redaction"), *aff'd*, 703 F.3d 575 (D.C. Cir. 2013); *cf. Mead Data Ctr.*, 566 F.2d at 261 ("[I]f only ten percent of the material is non-exempt and it is interspersed line-by-line throughout the document, an agency claim that it is not reasonably segregable because . . . the result would be an essentially meaningless set of words and phrases might be accepted."). The Bureau rightly claimed Exemption 7(E) to withhold the information the Committee seeks from the Cleveland Field Office communications. It does not need to take any further action on those records.

### c. The 26 Pages Withheld in Full

Related to the Cleveland Field Office communications are the 26 pages for which the Bureau provided page-by-page exemptions to justify withholding them in full. One can tell that the two sets of records are related because, as mentioned, the Bureau's public *Vaughn* index indicates that they are in the same file. *See* Public *Vaughn* Index. That index shows that the 26 pages consist of two 13-page documents with the same claimed exemptions for each of their 13

pages.  *See id.*  For every page, the Bureau says that Exemption 7(E) applies because the information deals with the investigative focus of a specific investigation and an undercover operation.  *See id.*  Each document also contains pages with information about FBI units and monetary payments for investigative techniques.  *See id.*  The Bureau provides additional information on what the 26 pages consist of and why it withheld them in its *in camera* affidavits.

Once again, the Bureau's declarants assert that releasing the pages' discussion of an undercover operation could tip off wrongdoers as to when, how, and where the Bureau is likely to use the filmmaker technique.  *See* 4th Seidel Decl. ¶¶ 135, 141, 149–150.  The Court agrees. Based on the Bureau's *in camera* submissions, the pages appear to be rife with the kinds of "confidential details" that Exemption 7(E) protects because revealing them would "reduce or nullify" a law enforcement technique's effectiveness.  *See Elec. Frontier Found.*, 384 F. Supp. 3d at 10 (first quoting *Sussman*, 494 F.3d at 1112; and then quoting *Vazquez v. U.S. Dep't of Just.*, 887 F. Supp. 2d 114, 116 (D.D.C. 2012)).  Moreover, the Bureau's description of the documents corroborates an agency declarant's claim that "no information could be reasonably segregated for release" without resulting in only "disjointed words, phrases, or sentences, which . . . would have minimal or no informational content."  *See* 4th Seidel Decl. ¶ 164; *see also Mead Data Cent.*, 566 F.2d at 260 ("It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions.").  The Bureau was therefore entitled to withhold the 26 pages in their entirety.

### d.  The Bureau's Filmmaker Impersonation Policy

The last set of records that the Bureau seeks to protect under Exemption 7(E) is a policy entitled *Undercover Activities: Posing as a Member of the News Media or a Documentary Film Crew*.  4th Seidel Decl. ¶ 25.  When the agency released the policy to the Committee, it disclosed

the vast majority of the policy's language.  It made just a handful of redactions per page, and the redactions covered words and excerpts of sentences as opposed to full passages.  *See* 2d Townsend Decl., Ex. M.  Next to each redaction is a code designating why the agency says Exemption 7(E) applies.  *See id.*  The codes indicate that the information redacted from the policy relates to how the Bureau conducts undercover operations, the investigatory focus of operations, procedures used in national security investigations, and the names and locations of specialized FBI units.  *See id.*; *see also* Public *Vaughn* Index.[8]  As with the Cleveland Field Office communications, the Bureau's declarations describe in more detail the kind of information associated with each code.  *See* 4th Seidel Decl. ¶¶ 135, 140, 149, 152; Bender Decl. ¶¶ 35–36, 38, 47, 53–54.

Even without the redacted information, the policy's basic terms are clear.  At the outset, the document states that its purpose is to "set forth interim policy in support of the [redacted] regarding approval levels for sensitive circumstances specifically in situations in which employees represent, pose, or claim to be members of the news media or a documentary film crew."  2d Townsend Decl., Ex. M.  It provides that, in general, the FBI's Deputy Director must approve a proposed filmmaker operation after consultation with the Deputy Attorney General. *Id.*  The Deputy Director must then report approved filmmaker operations to the FBI's Undercover Review Committee.  *Id.*  In certain "urgent[]" circumstances, the policy permits lower-level FBI officials to authorize a filmmaker operation on an interim basis.  *Id.*  An official that grants interim authorization for a filmmaker operation must submit an application to the Deputy Director and Undercover Review Committee within 48 hours.  *Id.*

---

[8] Some of the redactions remove FBI phone numbers, email addresses, IP addresses, and nonpublic intranet addresses.  *See* 2d Townsend Decl., Ex. M; 4th Seidel Decl. ¶ 132.  The Committee does not seek that information.  *See* Pl.'s Mot. at 36 n.6.

The Reporters Committee complains that the Bureau did not provide enough detail on the information it redacted or its justifications for the redactions. Pl.'s Mot. at 12. But in the context of a policy whose basic tenets are apparent and for which the redactions are fairly specific, the coded justifications along with longer descriptions in the Bureau's declarations "provide[] 'a reasonable basis to evaluate [each] claim of privilege.'" *See Hodge*, 764 F. Supp. 2d at 141 (second alteration in original) (citation omitted) ("Because the function, and not the form, of the index is dispositive, our Circuit has upheld similar agency declarations coupled with coded categories, in lieu of *Vaughn* indices."). Indeed, the redactions are so well-tailored that "[a]ny more specificity would have entailed disclosure of the very information withheld." *See Keys v. U.S. Dep't of Just.*, 830 F.2d 337, 350 (D.C. Cir. 1987); *see also Fischer v. U.S. Dep't of Just.*, 596 F. Supp. 2d 34, 44 (D.D.C. 2009).

Upon review of the mostly released policy and the Bureau's declarations, the Court is convinced that the agency properly withheld the redacted information under Exemption 7(E) and demonstrated that it could not reasonably disclose more. The policy and declarations indicate that the redacted information concerns the circumstances in which the Bureau might conduct a filmmaker operation, what specialized FBI units would be involved in approving or participating in such an operation, and how long such an operation can last. *See* 2d Townsend Decl., Ex. M; 4th Seidel Decl. ¶¶ 140–41; Bender Decl. ¶¶ 47, 53–54. As the Bureau's declarants explain, revealing that information could enable wrongdoers "to discern the FBI's use of undercover operations, thus allowing them to detect FBI undercover operations" and respond accordingly. Bender Decl. ¶ 47. The Bureau has therefore shown that the redacted excerpts of its filmmaker impersonation policy could logically lead to circumvention of the law. And given the Bureau's precise redactions, the Court sees nothing to make it doubt that the agency disclosed as much as

reasonably possible. *See Hodge*, 764 F. Supp. 2d at 143–44; *Fischer*, 596 F. Supp. 2d at 44; *see also Sussman*, 494 F.3d at 1117. The Bureau does not need to release more of the filmmaker impersonation policy.

## 2. Exemption 7(A)

The Bureau withholds the last remaining set of records categorically under Exemption 7(A). That exemption protects "records or information compiled for law enforcement purposes" so long as producing them "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). It is meant "to prevent disclosures which might prematurely reveal the government's cases in court, its evidence and strategies, or the nature, scope, direction, and focus of its investigations, and thereby enable suspects to establish defenses or fraudulent alibis or to destroy or alter evidence." *Maydak v. U.S. Dep't of Just.*, 218 F.3d 760, 762 (D.C. Cir. 2000). The exemption "reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" *CREW*, 746 F.3d at 1096 (alterations in original) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978)). An agency can withhold law enforcement records under Exemption 7(A) if it demonstrates that "disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *Id.* (quoting *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).

As mentioned, the Bureau says that Exemption 7(A) protects 54 pages of records relating to its investigation of Cliven Bundy. Bender Decl. ¶ 7. Even though a district court dismissed the indictments of Bundy, two of his sons, and a supporter, a Bureau declarant explains that "the investigation is still ongoing due to superseding indictments on other subjects." *Id.* ¶ 8. The 54

pages contain material relevant to those subjects, one of whom is Gregory Burleson. *Id.*

Burleson was convicted of a variety of counts and has an appeal in his case pending. *Id.*; *see*
*also* Notice of Appeal, *United States v. Burleson*, No. 16-cr-46 (D. Nev. June 25, 2021), ECF

No. 3,546 (appealing recent denial of motion for new trial). According to the Bureau, releasing

the 54 pages could interfere with its pending investigation by giving subjects insight into its

methods and the evidence it collected, perhaps allowing them to destroy or tamper with

evidence. Bender Decl. ¶ 8.

The Committee takes issue with the Bureau's justification. It argues that Exemption 7(A)

has no business protecting records of the Bundy investigation because the case against him is

over. *See* Pl.'s Mot. at 15–16; Pl.'s Reply at 5–7. Moreover, the Committee continues, it makes

no sense that documents from an investigation arising out of events that took place over six years

ago would still be useful to law enforcement proceedings. Pl.'s Reply at 7. But the Bureau has

explained that the 54 pages contain information relevant to the ongoing investigation of other

subjects. *See Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 386 (D.C. Cir. 2007)

(upholding Exemption 7(A) withholding despite amicus implying "that no investigations

involving [one target] were still active" because "the government's affidavit state[d] that the

investigation at issue involves the 'ongoing collection of data' and that the withheld records

relate to 'potential criminal proceedings against individuals'"). Indeed, the Bureau named

Burleson as one subject whom the records relate to, and enforcement proceedings against him

are still ongoing. *See Kidder v. FBI*, 517 F. Supp. 2d 17, 27 (D.D.C. 2007) ("A pending appeal

of a criminal conviction qualifies as a pending or prospective law enforcement proceeding for

purposes of Exemption 7(A)."). The Committee's mere suggestion that the standoff occurred too

long ago for an enforcement proceeding to be occurring is not enough to overcome the

presumption of good faith afforded to agency affidavits. *See Hammouda v. U.S. Dep't of Just. Off. of Info. Pol'y*, 920 F. Supp. 2d 16, 24 (D.D.C. 2013) (explaining that the nine- to eleven-year-old age of records could not rebut the presumption of good faith afforded to an agency declaration that said an investigation was ongoing). The Bureau has shown that the withheld records relate to law enforcement proceedings that are pending or reasonably anticipated.

Yet "Exemption 7(A) does not authorize automatic or wholesale withholding of records or information simply because the material is related to an enforcement proceeding." *North v. Walsh*, 881 F.2d 1088, 1097 (D.C. Cir. 1989). An agency must also demonstrate that disclosure of withheld records would interfere with the related proceeding. *Id.* And when an agency seeks to withhold records categorically under Exemption 7(A), as the Bureau does, its task becomes "three-fold." *CREW*, 746 F.3d at 1098 (quoting *Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986)). "First, it must define its categories functionally. Second, it must conduct a document-by-document review in order to assign documents to the proper category. Finally, it must explain to the court how the release of each category would interfere with enforcement proceedings." *Id.* (quoting *Bevis*, 801 F.2d at 1389–90).

The Bureau has not done any of that. Rather than dividing the withheld documents into functional categories, it merely outlines the kinds of documents that comprise the 54 pages: "The document types at issue within the publicly acknowledged documents withheld pursuant to Exemption 7(A) are FD-1057 – Electronic Communications ("ECs"), FD-302 – internal FBI interview forms, FBI letters, and other evidentiary documentation." Bender Decl. ¶ 8 n. 12. Those descriptions are not functional; they do not provide enough information to allow the Court "to trace a rational link between the nature of the document and the alleged likely interference." *See Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986).

Indeed, they "give absolutely no indication of the substance of the information contained" at all. *See Bevis*, 801 F.2d at 1390 (holding that the Bureau could not justify withholding documents using categorical descriptions like "teletypes," "airtels," or "letters").

Nor does the Bureau offer a category-by-category explanation of how release of the withheld documents would interfere with enforcement proceedings. *See CREW*, 746 F.3d at 1099 (remanding to the agency for more explanation when it "identifie[d] two distinct categories of documents—FD–302s and investigative materials—[but] never explain[ed] how the specific risks entailed in premature disclosure of one category of document might differ from risk of disclosure of the other"). All it says is that release of the withheld 54 pages "could result in foreseeable harms including but not limited to providing investigative subjects insight into what and how the FBI gathered evidence of their wrongdoing and allowing them to destroy or tamper with evidence; and/or provide insight into the FBI's investigative approach." Bender Decl. ¶ 8. That bland explanation falls far short of what FOIA requires. "[T]o prevail under Exemption 7(A), the government must show, by more than conclusory statement, how the particular kinds of investigatory records requested would interfere with a pending enforcement proceeding." *North*, 881 F.2d at 1097 (quoting *Campbell v. Dep't of Health & Hum. Servs.*, 682 F.2d 256, 259 (D.C. Cir. 1982)); *see also Voinche v. FBI*, 46 F. Supp. 2d 26, 31 (D.D.C. 1999) (rejecting the Bureau's Exemption 7(A) claim because the agency "ma[de] only conclusory statements that the release of the file as a whole would result in the described adverse effects on the investigation"). The Bureau leaves open too many questions to make that showing. For example, given that Burleson was tried and convicted, did the Bureau already disclose the information it now withholds in criminal discovery? If it did, how would releasing that information here interfere with his

ongoing case?  The Bureau does not say, so the Court is left to guess.  Similar questions arise

with respect to other individuals under investigation.  More of an explanation is required.

As a result, the Bureau has not earned summary judgment with respect to the documents

it categorically withheld under Exemption 7(A).  That said, the Committee's request for

summary judgment is premature too.  The agency can submit new affidavits with the information

necessary to evaluate whether it properly claimed the exemption.[9]  Until then, there is not yet a

need to decide whether, as the Bureau asserts, "other underlying exemptions" apply.  *See* 4th

Seidel Dec. ¶ 38.

*       *       *

To summarize, the Bureau has properly withheld most of the information that the

Committee seeks.  Exemption 7(E) permits it to withhold the requested information in four of the

five sought-after records sets.  Because Exemption 7(E) covers those records, the Court does not

need to determine whether other exemptions might also apply.  But for records the Bureau claims

are categorically exempt under Exemption 7(A), the Bureau is not entitled to summary judgment.

It should submit supplemental affidavits to justify that withholding.  Finally, the Committee has

presented no good reason to audit the agency's affidavits by sampling some of the disputed

records for *in camera* review.  While the Bureau's explanation for withholding some records

categorically under Exemption 7(A) was lacking, the affidavits were otherwise sufficient and in

---

[9] In its briefs, the Committee also asserts that the FOIA Improvement Act's heightened foreseeability requirement applies to claims of Exemption 7(A).  *See* Pl.'s Mot. at 18.  The Court doubts the FOIA Improvement Act materially alters the standard articulated in Exemption 7(A)'s text for much the same reasons it held the Act did not do so for Exemption 7(E).  *See supra* section IV.B.1; *see also* 5 U.S.C. § 552(b)(7)(A) (exempting law enforcement records that "*could reasonably be expected* to interfere with enforcement proceedings" (emphasis added)).  Nevertheless, because the Bureau failed to properly justify its withholdings under Exemption 7(A), the Court does not need to reach the question of the FOIA Improvement Act's application.  The parties can address this issue in their next round of briefing.

no way suggested that the agency misrepresented any record's contents.  *See Larson*, 565 F.3d at

870.  The Court will not yet exercise its "broad discretion" to demand *in camera* review of the

disputed records.  *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (quoting

*Armstrong*, 97 F.3d at 577–78).


## V.  CONCLUSION

For the foregoing reasons, Defendants' motion for partial summary judgment (ECF No.

47) is **GRANTED IN PART AND DENIED IN PART**, Plaintiff's motion for partial summary

judgment (ECF No. 49) is **DENIED**, and Plaintiff's motion for *in camera* review (ECF No. 50)

is **DENIED**.  An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated: July 12, 2021                                                    RUDOLPH CONTRERAS
                                                                                    United States District Judge