**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| REPORTERS COMMITTEE FOR | : | | |
| FREEDOM OF THE PRESS, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 17-1701 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 64, 65 |
| | : | | |
| FEDERAL BUREAU OF INVESTIGATION, | : | | |
| *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY
JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR
PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises out of a Freedom of Information Act ("FOIA") dispute between Plaintiff

Reporters Committee for Freedom of the Press ("the Committee") and Defendants Federal

Bureau of Investigation ("FBI") and United States Department of Justice ("DOJ"). In 2017, the

Committee asked the FBI for records relating to the FBI's impersonation of documentary

filmmakers and film crews. The FBI has since disclosed some records but withheld others under

various FOIA exemptions. The parties' dispute now centers solely on 54 pages of records. With

respect to these records, the FBI withheld many pages in part or full on the basis of Exemptions

5, 6, 7(C), 7(D), and 7(E). The FBI has it mostly right but will need to disclose some additional

information. For the reasons described below, the Court will grant in part and deny in part both

parties' motions for partial summary judgment.

## II.  BACKGROUND

The Court will draw the factual background of this case from its previous two opinions. *See Reps. Comm. for Freedom of Press v. FBI ("Reporters I")*, 369 F. Supp. 3d 212, 215–217 (D.D.C. 2019); *Reps. Comm. for Freedom of the Press v. FBI ("Reporters II")*, 548 F. Supp. 3d 185, 191 (D.D.C. 2021).  In brief, the Committee's lawsuit has its origins in a series of news events that brought public attention to law enforcement's practice of impersonating journalists and documentary filmmakers.  The most prominent of those events involved an armed standoff between federal law enforcement officers and Nevada cattle rancher Cliven Bundy.  *See Reporters I*, 369 F. Supp. 3d at 216.  During the subsequent prosecution of Bundy and his supporters, the federal government revealed that FBI agents posed as documentary filmmakers to lure suspects into speaking with them.  *Id.* at 216–17.  Media coverage of the Bureau's undercover operation—called "Operation Longbow"—prompted the Committee to request information about the filmmaker impersonation tactic.  *See id.* at 217.  Its FOIA request sought eight kinds of records.  *See* Defs.' Statement of Material Facts as to Which There Is No Genuine Issue ¶ 1, ECF No. 47-2.  Items 1 through 5 of the request asked for records pertaining to the Bundy standoff.  *Id.*  Items 6 through 8 were framed more broadly to include the FBI's undercover documentary activities that were not limited to the Bundy standoff.  *Id.*

In *Reporters II*, the Court addressed the parties' cross-motions for partial summary judgment regarding the FBI's handling of responsive records to Item 6–8.  548 F. Supp. 3d at 191.  It held that the FBI had adequately justified its withholdings except for one group of the disputed records.  *Id.*  For that group, which consisted of 54 pages, the FBI categorically claimed Exemption 7(A) on the basis that the records related to the FBI's investigation of Cliven Bundy.  *Id.* at 206.  The Court lacked sufficient information to find that Exemption 7(A) applied and

therefore denied the FBI summary judgment with respect to these pages but gave the FBI another chance to provide more details to justify its withholding.  *Id.*

At some point following *Reporters II*, the FBI concluded that Exemption 7(A) no longer applied to these 54 pages because the investigation at issue concluded and all appeal proceedings were also resolved.  *See* Defs.' Mot. Extension of Time to File ¶ 3(a), ECF No. 61.  The FBI therefore reprocessed the 54 pages, which resulted in its decision to release 26 pages in part and withhold 28 pages in full.  2d Bender Decl. ¶ 12, ECF No. 64-3.  These 54 pages "are records responsive to Item 7 of Plaintiff's FOIA request, which seeks 'records of any professional credentials, websites and business cards used by FBI agents in connection with the impersonation of a documentary filmmaker and/or a documentary film crew since January 1, 2010.'"  Pl.'s Renewed Cross-Mot. for Partial Summ. J. ("Pl.'s Cross-Mot.") at 2, ECF No. 65 (citing 2d Bender Decl. ¶ 3).

The FBI has now renewed its motion for partial summary judgment with respect to these 54 pages, claiming that the withheld portions of these 54 pages are protected by Exemptions 5, 6, 7(C), 7(D), and 7(E).  Defs.' Mem. of Points and Authorities in Support of Defs.' Renewed Mot. Summ. J. ("Defs.' Mot.") at 5, ECF No. 64-1.  In support of its motion, the FBI attaches declarations from Joseph E. Bender, Jr., the Acting Section Chief of FBI's Record/Information Dissemination Section ("RIDS"), and Michael G. Seidel, the Section Chief of RIDS.  2d Bender Decl. ¶ 1; 6th Am. Seidel Decl. ¶ 1, ECF No. 71-2.[1]

---

[1] Defendants filed their reply at ECF No. 68, but later submitted a corrected reply at ECF No. 71-4 which corrected a minor, undisputed fact.  *See* Defs.' Errata at 1, ECF No. 71.  The Court will consider the Defendants' corrected reply as their reply brief.  For the same reason, it will also consider the 6th Amended Seidel Declaration, ECF No. 71-2, in lieu of the 6th Seidel Declaration, ECF No. 68-2.

On the other side, the Committee has renewed its cross-motion for partial summary judgment. It concedes that the FBI's withholdings pursuant to Exemption 5 and 7(D) are proper. Pl.'s Cross-Mot. at 3 n.2. It also concedes as proper the FBI's withholding under Exemptions 6 and 7(C) of information concerning third parties of investigative interest and individuals who provided information to the FBI. *Id.* But it disputes all of the FBI's application of Exemption 7(E), and it disputes the application of Exemption 6 and 7(C) to the identities of FBI special agents and professional staff. *Id.* at 3. In support of its motion, the Committee attaches two declarations from its Legal Director, Katie Townsend. 3d Townsend Decl. ¶ 1, ECF No. 65-3; 4th Townsend Decl. ¶ 1, ECF No. 70-2. The cross-motions are now ripe for decision.

### III.  LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). It "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions." *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)). "Consistent with the Act's goal of broad disclosure," those exemptions should be "given a narrow compass." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989). "The agency bears the burden of establishing that a claimed exemption applies." *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just. ("CREW")*, 746 F.3d 1082, 1088 (D.C. Cir. 2014).

Because FOIA cases do not ordinarily involve disputed facts, they "are typically and appropriately decided on motions for summary judgment." *Moore v. Bush*, 601 F. Supp. 2d 6, 12 (D.D.C. 2009) (citations omitted). Summary judgment is warranted "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing whether the movant has met that burden, a court "must view the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in his favor, and eschew making credibility determinations or weighing the evidence." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) (citations omitted). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure . . . .'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)). "Typically, the agency demonstrates the applicability of a FOIA exemption by providing affidavits regarding the claimed exemptions." *Shapiro v. U.S. Dep't of Just.*, 893 F.3d 796, 799 (D.C. Cir. 2018). "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (citation omitted). Even if a FOIA exemption applies, an agency cannot withhold information unless it also "reasonably foresees that disclosure would harm an interest protected by" the exemption. 5 U.S.C. § 552(a)(8)(A)(i)(I); *see Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (explaining the FOIA Improvement Act of 2016's "foreseeable harm" requirement).

## IV.  ANALYSIS

The only issues currently in dispute are the FBI's withholding of: (1) the names of FBI special agents and professional staff, including pseudonyms, under Exemptions 6 and 7(C); and

(2) various subcategories of information under Exemption 7(E).  The Court will examine each in turn.[2]

## A.  Exemptions 6 and 7(C)

The FBI relied on Exemptions 6 and 7(C) to withhold information about the identities of FBI special agents and professional staff, including pseudonyms, in the Bundy investigation.  *See* 2d Bender Decl. ¶¶ 20–24.  The Committee only challenges the FBI's withholding of pseudonyms and the names of FBI special agents Adam Nixon, Michael Caputo, Andrew Gruninger, and Joel Willis.  Pl.'s Cross-Mot. at 5.

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) protects "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  When all of the requested information serves a law enforcement purpose, courts will "confine [the] analysis to Exemption 7(C)."  *People for the Ethical Treatment of Animals v. Nat'l Institutes of Health, Dep't of Health & Hum. Servs. ("PETA")*, 745 F.3d 535, 541 (D.C. Cir. 2014) (explaining that Exemption 7(C) standard is "broader").  Here, there is no dispute that all of the requested information serves law enforcement purposes.  Defs.' Mot. at 11; Pl.'s Cross-Mot. at 3.  Therefore, the Court will examine the FBI's withholding under Exemption 7(C).

---

[2] The FBI represents that it conducted an adequate search for Items 6 and 7.  Defs.' Mot. at 1 n.1.  The Committee does not contest that.  *See generally* Pl.'s Cross-Mot.; Pl.'s Reply.

"To meet its burden of establishing that Exemption 7(C) applies, the agency must demonstrate that (1) disclosure could 'reasonably be expected to constitute an unwarranted invasion of privacy' and (2) the 'personal privacy interest' is not 'outweighed by the public interest in disclosure.'" *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 718 (D.C. Cir. 2021) (quoting *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 160 (2004)). "Once the agency shows that the 'privacy concerns addressed by Exemption 7(C) are present,' the party seeking disclosure must show 'that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and that 'the information is likely to advance that interest.'" *Id.* (quoting *Favish*, 541 U.S. at 172).

"Exemption 7(C) 'affords broad[ ] privacy rights to suspects, witnesses, and investigators.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1205 (D.C. Cir. 1991) (quoting *Bast v. Dep't of Just.*, 665 F.2d 1251, 1254 (D.C. Cir. 1981)). In *SafeCard*, the D.C. Circuit created a "categorical[]" rule regarding Exemption 7(C)'s application to names and other personal identifying information: "unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure." *Id.* at 1206; *see also Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 896 (D.C. Cir. 1995) ("As a general rule, *SafeCard* directs an agency to redact the names, addresses, or other identifiers of individuals mentioned in investigatory files in order to protect the privacy of those persons.").

Here, Exemption 7(C) does not justify the FBI's withholding of pseudonyms. The Committee argues that because the "very purpose" of a pseudonym "is to shield an individual's true identity," there is no privacy interest in a pseudonym. Pl.'s Reply Mem. of Law in Support

of Pl.'s Renewed Cross-Mot. for Partial Summ. J. ("Pl.'s Reply") at 7, ECF No. 70.  The FBI

does not respond to this point, but instead argues that there is "no evidence that releasing

any . . . pseudonyms would shed light on the government's activities."  Corrected Combined

Reply in Support of Defs.' Renewed Mot. for Partial Summ. J. and Opp'n to Pl.'s Renewed

Cross-Mot. for Partial Summ. J. ("Defs.' Reply") at 5, ECF No. 71-4.  But that puts the cart

before the horse, because as a preliminary matter, the FBI has the "burden" to show that the

"privacy concerns addressed by Exemption 7(C) are present."  *Electronic Privacy*, 18 F.4th at

718 (citation omitted).  This it has not done.  The FBI does not claim, for example, that the

pseudonyms in the 54 pages of records can be readily traced to or otherwise reveal the

underlying individual's identity.  Thus, the FBI must release all pseudonyms in the 54 pages of

records.

    The Committee's challenge regarding the four FBI special agents, however, misses the

mark.  Under *SafeCard*, these individuals' names and identifying information "are presumptively

exempt from disclosure."  *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 666 (D.C. Cir. 2003);

*see Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1491 (D.C. Cir. 1984) ("[D]espite the fact

that FBI agents are public officials, they have a 'legitimate interest in preserving the secrecy of

matters that conceivably could subject them to annoyance or harassment in either their official or

private lives.'" (citation omitted)).  The Committee argues that their names cannot be withheld

because these agents have already been publicly associated with the Bundy investigation.  *See,

e.g.*, Ex. A to 3d Townsend Decl., ECF No. 65-3 (news article mentioning that Mr. Nixon

participated in the Bundy investigation); Ex. P to 3d Townsend Decl., ECF No. 65-3 (news

article mentioning that Mr. Willis was a key witness in the government's criminal case).  The

Committee offers transcripts of the trial testimonies of Special Agents Caputo, Nixon, and Willis

to show that they were involved in the Bundy investigation.  *See* Caputo Tr. 174:19–23, Ex. A to 4th Townsend Decl., ECF No. 70-2; Nixon Tr. Vol. 2 at 4:22–25, Ex. B to 4th Townsend Decl., ECF No. 70-2; Willis Tr. 12-103:14–21, Ex. C to 4th Townsend Decl., ECF No. 70-2.[3]

When an individual "himself has made several public statements . . . that involve the subject matter of those disclosures . . . Exemption 7(C) . . . would not serve any useful purpose in protecting his privacy."  *National Magazine*, 71 F.3d at 896.  Such public disclosures by the individual "effectively waive" the individual's "right to redaction of his name from documents on events that he has publicly discussed."  *Id.*  But "[f]or the public domain doctrine to apply, the specific information sought must have already been disclosed and preserved in a permanent public record."  *Kowal v. U.S. Dep't of Just.*, No. 18-cv-938, 2021 WL 3363445, at *5 (D.D.C. Aug. 3, 2021) (quoting *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001)); *see also Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97, 127 (D.D.C. 2021) (applying public domain doctrine to Exemption 7(C) analysis of special agents' identifying information).  The issue is therefore whether these publicly available documents "effectively waive" these individuals' right to keep their names redacted on the 54 pages of records.  *National Magazine*, 71 F.3d at 896.

The answer is no.  News reports associating an individual with an investigation do not waive an individual's privacy interest in that investigation.  *See, e.g.*, *Codrea v. ATF*, No. 21-cv-2201, 2022 WL 4182189, at *8 (D.D.C. Sept. 13, 2022).  Likewise, "[i]t is established . . . that individuals do not waive their privacy rights merely by testifying at trials."  *Peay v. Dep't of*

---

[3] The Court may take judicial notice "of facts on the public record in other proceedings," *Moore v. Robbins*, 24 F. Supp. 3d 88, 96 n.7 (D.D.C. 2014) (quoting *Covad Comm's Co. v. Bell Atl. Corp.,* 407 F.3d 1220, 1222 (D.C. Cir. 2005)), as well as the existence of the news articles, *Shive-Ayala v. Pacelle*, No. 21-cv-704, 2022 WL 782412, at *2 (D.D.C. Mar. 15, 2022).

*Just.*, No. 4-cv-1859, 2006 WL 1805616, at *3 (D.D.C. June 29, 2006) (quoting *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1281–82 (D.C. Cir. 1992)).  That principle rings especially true in this case because of the mismatch between the special agents' trial testimonies and the information that the Committee seeks in the 54 pages of records.  According to the Committee, three of the four named special agents testified in the Bundy criminal case that they were involved in the Bundy investigation.  *See* Pl.'s Reply at 9–10 (identifying Special Agent Caputo's testimony that he was involved in the "investigation of the Bundy matter"; Special Agent Nixon's testimony that he was "involved in the investigation of events taking place in . . . Bunkerville, Nevada"; Special Agent Willis's testimony that he was "assigned [to] an investigation into the events of April 12th, 2014" (quoting trial transcripts)).  These testimonies, however, only reveal the fact that these special agents were involved in *some* capacity in the Bundy investigation—an enormous, multi-year effort which resulted in the prosecution of over a dozen defendants, including Cliven Bundy and two of his sons.  *See United States v. Bundy*, 968 F.3d 1019, 1022 (9th Cir. 2020).  By comparison, the 54 pages of records at issue here concern a specific subject matter: "any professional credentials, websites and business cards used by FBI agents in connection with the impersonation of a documentary filmmaker and/or a documentary film crew since January 1, 2010."  Pl.'s Cross-Mot. at 2 (citing 2d Bender Decl. ¶ 3)).

This stark mismatch is fatal to the Committee's position.  The Committee has made no effort to show that the special agents have publicly disclosed their involvement in the Bundy investigation *in connection with the filmmaker impersonation tactic*.  *See Davis*, 968 F.2d at 1280 ("Davis has not satisfied his burden to point to specific information in the public domain.").  For that reason, the special agents have not waived their privacy rights to their identifying information in the 54 pages of records.  *See Lardner v. U.S. Dep't of Just.*, No. 3-cv-180, 2005

WL 758267, at *19 (D.D.C. Mar. 31, 2005) ("Although the identity of some of these individuals may be public[ly] known, their presence in an FBI investigatory file is not."); *Sellers v. U.S. Dep't of Just.*, 684 F. Supp. 2d 149, 159–60 (D.D.C. 2010) ("Even if plaintiff already knows the identities of trial witnesses, the agency's decision to withhold their names and other identifying information under Exemption 7(C) is justified.").

The Committee's cases are inapposite.  In *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97 (D.D.C. 2021), the FOIA requester sought agency records related to the agency's issuance of a summons to Twitter concerning the Twitter account of an individual who was critical of the agency.  *Id.* at 107.  The summons contained the names of two special agents from the agency.  *Id.*  The court ruled that the agency could not redact the names of these two special agents in its production because given the fact that the special agents' "names appeared on the Twitter summons and in the subsequent litigation," "[t]heir involvement with the summons therefore exists in the public domain."  *Id.* at 127.  Whereas the special agents' names in that case were publicly available on the document forming the center of the controversy, nothing in this case that the Committee has demonstrated is publicly available shows that the special agents were involved "in connection with the impersonation of a documentary filmmaker and/or a documentary film crew."  *See* Pl.'s Cross-Mot. at 2; 2d Bender Decl. ¶ 3.  In other words, here, the agents' "involvement" with the filmmaker impersonation tactic does not "exist[] in the public domain."  *Reporters Committee*, 567 F. Supp. 3d at 127.

*United Am. Fin., Inc. v. Potter*, 667 F. Supp. 2d 49 (D.D.C. 2009), is also disanalogous. There, the requester sought information from USPS regarding an investigation into whether the requester was engaged in an identity theft scam involving USPS employees.  *Id.* at 53.  In its production, USPS redacted identifying information of its newsletter's editorial staff, claiming

Exemptions 6 and 7(C).  *Id.* at 62–63.  The court, however, found that these individuals lacked "any privacy interest" in disclosure of their identifying information for the simple reason that their names were already publicly available "on the current version of the [newsletter's] website."  *Id.* at 63.  Therefore, the court required USPS to "release the page with the editorial staff information in full."  *Id.*  Unlike *United America*, the Committee has not shown that the special agents' involvement with the filmmaker impersonation tactic is publicly available information.  To the contrary, as discussed above, it has made no effort to match the agents' trial testimonies with the subject matter of the 54 pages of records.

Having established that Exemption 7(C) applies, the FBI has also shown that it "reasonably foresees disclosure would harm an interest protected by [the] exemption."  5 U.S.C. § 552(a)(8)(A)(i)(I).  The FBI has stated that disclosure of agent names could lead to harassment of agents and their families and also impair their duties.  2d Bender Decl. ¶¶ 23–24.  The FBI observed that in retaliation for the Bundy investigation, militia groups have already targeted several agents and their families by posting their personal information and home addresses on social media.  *Id.* ¶ 23.  Disclosure of the information that the Committee seeks here would likewise jeopardize these agents' privacy.  If someone "carry[ing] a grudge" knew that an agent performed a particular role in the Bundy investigation, he could "seek revenge."  *Id.*  Therefore, the FBI properly invoked Exemption 7(C) to withhold the information in question.

### B. Exemption 7(E)

Exemption 7(E) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions

if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C.

§ 552(b)(7)(E).  A record must therefore meet three requirements to qualify for the exemption:

(1) it must be "compiled for law enforcement purposes"; (2) the release of the record must

disclose techniques, procedures, or guidelines used for law enforcement investigations or

prosecutions; and (3) it must be that the disclosure of those techniques, procedures, or guidelines

"could reasonably be expected to risk circumvention of the law."  *See Advancement Project v.*

*U.S. Dep't of Homeland Sec.*, 549 F. Supp. 3d 128, 142 (D.D.C. 2021).

Two points bear clarifying with respect to Exemption 7(E)'s third requirement.  First,

according to D.C. Circuit caselaw, an Exemption 7(E) claimant must show a risk of

circumvention of the law regardless of whether a law enforcement technique, procedure, or

guideline is at stake.  *See Pub. Emps. for Env't Resp. v. U.S. Sec., Int'l Boundary and Water*

*Comm'n, U.S.-Mexico*, 740 F.3d 195, 204 n.4 (D.C. Cir. 2014) (remarking that, unlike the

Second Circuit, the D.C. Circuit has applied the "risk of circumvention" requirement to

techniques and procedures in addition to guidelines).  Second, the language of this

requirement—"could reasonably be expected to risk circumvention of the law"—supplants the

FOIA Improvement Act's general requirement that an agency must disclose records unless it is

reasonably foreseeable that disclosure would harm the interest the claimed exemption protects.

*See Reporters II*, 548 F. Supp. 3d at 196–97 & n.2.[4]

---

[4] The Committee erroneously claims that the FOIA Improvement Act's heightened standard applies to Exemption 7(E).  Pl.'s Cross-Mot. at 11–13 (citing 5 U.S.C. § 552(a)(8)(A)(i)(I)).  *Reporters II* already rejected the Committee's argument and explained in detail that "the FOIA Improvement Act does not heighten [Exemption 7(E)'s] substantive standard."  *See Reporters II*, 548 F. Supp. 3d at 196–97 & n.2; *accord Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 525 F. Supp. 3d 181, 192 & n.4 (D.D.C. 2021).  The Committee cites *Reps. Comm. for Freedom of the Press v. U.S. Customs & Border Prot.*, 567 F. Supp. 3d 97 (D.D.C. 2021), as evidence of a court in this District adopting the heightened

Here, the FBI invoked Exemption 7(E) over portions of the 54 pages of records.  After the Committee renewed its cross-motion for partial summary judgment, however, the FBI decided to reprocess the 54 pages of records and removed certain redactions it had previously made under Exemption 7(E).  *See* 6th Am. Seidel Decl. ¶ 6; Pl.'s Reply at 1, 3–6 (listing newly released information).  The Committee contends that the FBI's mid-briefing disclosures "casts serious doubt on the veracity of the declaration of Joseph Bender . . . and precludes summary judgment for Defendants' Exemption 7(E) claims on the basis of their declarants alone."  *Id.* at 4. The Court rejects that suggestion.  To the extent that the Committee is alleging that the agency discharged its FOIA duties in bad faith, it has not produced any evidence that would lead the Court to believe that the agency intentionally tried to withhold documents it knew must be disclosed.  *Cf. McGehee v. CIA*, 697 F.2d 1095, 1113 (D.C. Cir. 1983) (finding "cumulative weight" of agency's multi-year delay in processing request and its improper search cut-off date as evidence of bad faith).  If anything, the FBI's revised release with respect to previously withheld documents under Exemption 7(E) shows that the agency was attentive to the arguments raised in the Committee's cross-motion and made a good-faith effort to revise its production accordingly.  *See* 6th Am. Seidel Decl. ¶ 16 ("Plaintiff's Opposition provided certain information that upon further review, the FBI determined was within the public domain and should be released.").  The Court declines to penalize the agency for taking additional steps to comply with its FOIA obligations and release more information in response to the requester's briefing.  *Cf. Khatchadourian v. Def. Intel. Agency*, 453 F. Supp. 3d 54, 79 (D.D.C. 2020) ("DIA was entitled to reprocess the records and change its mind about whether they were classified.  Agencies

---

standard for Exemption 7(E), but in fact that case expressly endorsed *Reporters II*'s view on this issue.  *Id.* at 127.

frequently do this, and oftentimes they realize that they can release documents they previously thought should be exempt.").

With that housekeeping out of the way, the Court turns to the merits.  As discussed above, the Committee does not dispute that these are law enforcement records.  Thus, the FBI has satisfied Exemption 7(E)'s first requirement.  The remaining issues are whether these files include law enforcement techniques, procedures, or guidelines and whether disclosure could risk circumvention of the law.  The FBI has grouped its application of Exemption 7(E) into four categories: (1) undercover unit/squad information; (2) specific investigations; (3) undercover operations; and (4) monetary payments.  The Court will assess whether each category of information satisfies Exemption 7(E).

### 1. Undercover Unit/Squad Information

The FBI invokes Exemption 7(E) to "protect[] methods and techniques involving the location and identity of certain specialized FBI units or joint units, squads and divisions that were involved in the investigations."  2d Bender Decl. ¶ 42.  The FBI claims that besides the involvement of the Las Vegas Field Office, "it is not publicly known if other [FBI Headquarters] divisions, squads, or joint task forces assisted."  *Id.* ¶ 43.  The FBI's declarant explains how disclosure could reveal FBI techniques regarding how it allocated resources and manpower in this investigation and the reach of the investigation's geographic scope.  *Id.* ¶¶ 41–43. Disclosure of this information could risk circumvention of law, which "requires only that an agency 'demonstrate logically how the release of the requested information *might* create a risk of circumvention of the law.'"  *Reporters Committee II*, 548 F. Supp. 3d at 200 (emphasis in original) (quoting *Mayer Brown*, 562 F.3d at 1194).  Under the FBI's mosaic theory, which posits that seemingly innocuous information "when taken together" in the aggregate could reveal

protected information, a potential lawbreaker could piece together this information to draw conclusions about the FBI's investigatory methods. *See id.* at 199–200 (describing the mosaic theory and finding that the FBI properly invoked it); 2d Bender Decl. ¶ 43. The Court finds the FBI's explanation logical and plausible.

The Committee's counterarguments are unpersuasive. It avers that the locations of the FBI's operations "are well documented" from news articles and that the FBI would have necessarily "reli[ed] on local FBI offices, squads, and divisions along the way." Pl.'s Cross-Mot. at 16. It also claims that the FBI "routinely" discloses which FBI units are involved in a particular investigation but only cites a single example. *Id.* at 18. But even if news articles give the public an idea of the various *locations* involved in the Bundy investigation, they do not disclose the specific FBI *units* that were involved in the investigation and how the FBI allocated unit resources. The Committee speculates that FBI units only work locally, but nothing in the record confirms this. Nor does the Committee show that the locations mentioned in news articles account for the full geographic scope of the investigation. In addition, the analysis does not change simply because the FBI has at some point in the past disclosed the involvement of a field office in an unrelated case. The FBI did *not* disclose undercover unit/squad information in this case, and the Committee has not pointed to evidence to suggest otherwise. *Cf. Shapiro v. Dep't of Just.*, No. 12-cv-313, 2020 WL 3615511, at *38 (D.D.C. July 2, 2020) (finding that FBI was entitled to withhold unit identities and location even if "some exempt information slips through the cracks" unintentionally), *aff'd in relevant part*, 40 F.4th 609 (D.C. Cir. 2022). This information is therefore appropriately withheld under Exemption 7(E).

2.  Focus of Specific Investigations

The FBI also invokes Exemption 7(E) to protect information regarding the focus of specific investigations.  *See* 2d Bender Decl. ¶¶ 44–45.  The Court interprets this to mean specific investigations within the larger context of the Bundy investigation, which concerns not just Cliven Bundy but other related subjects.  *See Reporters II*, 548 F. Supp. 3d at 206–07.  The Committee counters that the FBI has not identified a single technique, procedure, or guideline it is seeking to protect.  Pl.'s Cross-Mot. at 19.[5]  But the FBI has the better view, because revealing the FBI's points of focus in the particular investigations would necessarily reveal its techniques and procedures.  *See Whittaker v. U.S. Dep't of Just.*, No. 18-cv-01434, 2019 WL 2569915, at *2 (D.D.C. June 21, 2019) ("The phrase 'techniques and procedures' . . . refers to how law enforcement officials *go about* investigating a crime." (emphasis in original) (quoting *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010))).  The FBI's declarant states that "[r]eleasing the focus of specific FBI investigations would enable criminals to predict the FBI's investigative strategies, structure their activities in a manner that thwarts the FBI's investigative efforts, and continue to circumvent the law."  2d Bender Decl. ¶ 45.  The Court finds this explanation logical and plausible.  Indeed, courts in this District routinely allow the FBI to protect this kind of information.  *See, e.g.*, *Shapiro*, 2020 WL 3615511, at *40 (finding FBI was entitled to protect investigative focus of specific investigations under Exemption 7(E)); *Poitras v. Dep't of Homeland Sec.*, 303 F. Supp. 3d 136, 159 (D.D.C.

---

[5] The Committee also argues that the FBI's withdrawal of Exemption 7(A) as a basis to protect this information shows that disclosure would not enable criminals to change their behavior to avoid detection or prosecution.  Pl.'s Cross-Mot. at 20.  But the Committee's argument conflates Exemption 7(A) with Exemption 7(E) without citing any caselaw for the proposition that the two exemptions rise or fall together.  The Court must therefore analyze whether Exemption 7(E) applies even if Exemption 7(A) does not.

2018) (same); *Amuso v. U.S. Dep't of Just.*, 600 F. Supp. 2d 78, 101 (D.D.C. 2009) (same).  The
Court will do the same here.

### 3.   Undercover Operations

The FBI invokes Exemption 7(E) to withhold details regarding the "length, breadth, and
methodology" of undercover operations.  2d Bender Decl. ¶ 47; *see* Defs.' Reply at 12.  The
FBI's declarant acknowledged that while some information exists in the public domain regarding
the Bundy investigation, the FBI only seeks to protect "non-public details" of its investigation,
such as "the extent operatives can infiltrate organizations," "covert communication techniques,"
and "approval requirements for different facets of undercover operations."  2d Bender Decl. ¶ 47.
Mr. Bender explained that "[s]ecrecy and discretion are essential when conducting effective
undercover operations" and that disclosure would undermine "the viability of such operations"
and the ability of "FBI undercover operatives and operations to be deployed, undetected."  *Id.*
Revealing this information could allow wrongdoers to "detect FBI undercover operations in the
future . . . as well as place[] undercover operatives in harm's way."  *Id.*  For its part, the
Committee argues that any withholding on this basis is improper because "much is known" about
the length, breadth, and methodology of the Bundy investigation.  Pl.'s Cross-Mot. at 23.

The FBI, once again, has the better view.  It is true that as a result of media attention and
the criminal trials, the public is aware of the FBI's filmmaker impersonation technique and
knows at least some details about the FBI's operations.  That certain public information exists
about the Bundy investigation, however, does not undermine the FBI's withholding of *non-
public* information about its undercover operations concerning the Bundy investigation.  The FBI
has represented that this is the portion it is withholding, and the Court has no basis here to doubt
it.  As other judges in this District have noted in FOIA cases involving the FBI's undercover

operations, Exemption 7(E) still applies where, as here, plaintiff "cannot show that the Bureau has acknowledged all of the withheld undercover techniques." *Cabezas v. FBI*, No. 19-cv-145, 2022 WL 898789, at *10 (D.D.C. Mar. 28, 2022).  Because the Committee has failed to make that showing, "[r]evealing additional details could provide potential wrongdoers further information about the Bureau's operations and could decrease the efficacy of the Bureau's techniques." *Id.*; *see also Shapiro*, 2020 WL 3615511, at *40 (affirming FBI's withholding of non-public details about undercover operations); *Watson v. U.S. Dep't of Just.*, No. 18-cv-1645, 2020 WL 5505346, at *5 (D.D.C. Sept. 10, 2020) (same).

The FBI, however, may not withhold information from its Longbow Productions webpage.  With respect to this webpage, the FBI contends that "[r]evealing undercover operational information that the FBI has not publicly acknowledged would place the use of such techniques at risk for circumvention of the law." 6th Am. Seidel Decl. ¶ 27.  So the issue turns on whether the Longbow Productions webpage is publicly available.  "[F]or the public domain doctrine to apply, the specific information sought must have already been 'disclosed and preserved in a permanent public record.'" *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 963 F. Supp. 2d 6, 12 (D.D.C. 2013) (quoting *Cottone*, 193 F.3d at 554).  Here, the Committee attached to its briefing screenshots of the FBI's Longbow Productions webpage which it accessed through a site called the Internet Archive Way Back Machine.  *See* Ex. L to 3d Townsend Decl., ECF No. 65-3.[6]  The FBI does not dispute the authenticity of this information.  Instead, it argues that this information does not exist in the public domain because the Longbow Productions webpage,

---

[6] The Internet Archive Way Back Machine is a non-profit "digital library of Internet sites" that "archiv[es] the Internet itself."  *See* About the Internet Archive, Archive.org, https://archive.org/about/.  It is "widely recognized and relied upon by the public, press, and courts in this Circuit."  Pl.'s Reply at 18 (citing cases).

which the FBI has since taken down, is not "easily accessible" and therefore not "actually in the

public domain." Defs.' Reply at 13. But the FBI's cramped notion of the public domain makes

no sense, and it cannot cite a single case for the proposition that only a website's original URL

can be in the public domain for FOIA purposes. The Committee's counsel has identified the

Longbow Productions webpage's archived URL link, which the Court, and any member of the

public, can readily access. *See* 3d Townsend Decl. ¶ 13, ECF No. 65-3.[7]  Thus, this information

has been "disclosed and preserved in a permanent public record." *Jud. Watch*, 963 F. Supp. 2d at

12 (quotation marks omitted). Therefore, the FBI cannot withhold information under Exemption

7(E) that duplicates information from this webpage.

### 4. Monetary Payments

The last category the FBI seeks to protect under Exemption 7(E) is monetary payments

that were either requested or paid by the FBI in the course of the Bundy investigation. 2d

Bender Decl. ¶¶ 48–49. The FBI's declarant claims that disclosure of this information would

show "what the FBI agent on the ground determined was necessary to conduct that operation"

and the FBI's "allocation nexus to an investigative scope or area." *Id.* ¶ 49. This information,

when aggregated with other information "in mosaic fashion," could give a potential wrongdoer

"a larger understanding of the FBI's priorities, investigative scope, and efforts." *Id.*  For its part,

the Committee argues that the FBI's spending on the Bundy investigation is no secret because a

judge in the Bundy criminal case remarked that the government's spending was "staggering."

Pl.'s Cross-Mot. at 26–27. The Committee also notes that the FBI's spending on the Bundy

---

[7] https://web.archive.org/web/20170824005541/http://www.longbowproductions.com/ (last visited October 21, 2022).

investigation would not reveal the FBI's general spending habits on investigations because the Bundy investigation involved "a particularly 'unique' scheme." *Id.* at 27 (citation omitted).

The FBI has the better view.  Although the public may know that the FBI spent a considerable amount in this investigation, it does not know precisely how much the FBI spent, much less *how* the FBI spent it.  The Committee's characterization of the Bundy investigation as unique does not lessen the insights that a potential wrongdoer may glean by comparing the FBI's spending priorities and patterns.  *Cf. Shapiro*, 2020 WL 3615511, at *38 ("Though the cost of one hotel room may not reveal much . . . the FBI must be cautious in revealing individual budget line-items lest it reveal the entire budget."); *see also Dutton v. U.S. Dep't of Just.*, 302 F. Supp. 3d 109, 124 (D.D.C. 2018) (approving FBI's reliance on Exemption 7(E) to withhold information concerning "monetary payments for investigative techniques").  Thus, this information is also protected under Exemption 7(E).

*          *          *

After properly invoking an exemption, an agency must also "take reasonable steps necessary to segregate and release nonexempt information."  5 U.S.C. § 552(a)(8)(A)(ii)(II).  Non-exempt portions of records need not be disclosed, however, if they are "inextricably intertwined with exempt portions."  *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).  An agency is presumed to have complied with the segregability requirement unless the FOIA requester points to evidence indicating otherwise.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Here, the FBI's declarant represented that the FBI performed a segregability analysis for all 54 pages at issue, which consisted of pages the FBI released in part and pages it withheld in full.  2d Seidel Decl. ¶ 50.  Mr. Seidel further stated that the FBI withheld information that was

21

"so intertwined with exempt material" that it could not be further segregated.  *Id.*; *see also* 6th Am. Seidel Decl. ¶ 16.  The Committee's briefing did not challenge the FBI's segregability analysis with respect to any of the 54 pages.  Thus, the Court is satisfied that the FBI has adequately segregated non-exempt information.

To sum up, the FBI is entitled to assert Exemption 6 and 7(C) to withhold the names and identifying information of its special agents and professional staff.  But it must disclose any pseudonyms.  In addition, the FBI is entitled to assert Exemption 7(E) to withhold the four categories of information described above.  But the FBI must disclose information that is already in the public domain such as that found on the Longbow Productions webpage.

## V.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion partial for summary judgment (ECF No. 64), and grants in part and denies in part Plaintiff's cross-motion for partial summary judgment (ECF No. 65).  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  October 21, 2022                                      RUDOLPH CONTRERAS
                                                              United States District Judge